PER CURIAM.
William A. Gregory appeals his convictions and death sentences for the August 2007 first-degree murders of Skyler Dawn *775 Meekins and Daniel Arthur Dyer. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Gregory’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
The Guilt Phase
William A. Gregory, who was twenty-four years old when the murders were committed, was for a time involved in a romantic relationship with Skyler Dawn Meekins, who was seventeen at the time she was murdered. Skyler and Gregory had a child together, although their romantic relationship ended in June 2007. Skyler and Gregory both continued, however, to participate in raising their child.
Around the time their relationship ended, Gregory was in jail and would often call Skyler’s house. On several occasions, he spoke with Skyler’s brother, and the two would discuss Skyler’s whereabouts and activities. During one call, Gregory said he was “stressing about Skyler” and asked for information regarding any other men who might be calling for Skyler. Gregory stated that he knew Skyler was “trying to ... get with dudes” and indicated that he would have to “kind of try to get over Skyler or something.”
During another call, Gregory asked Skyler’s brother to check Skyler’s e-mail account and online profile for other men with whom she might be communicating. Gregory told Skyler’s brother that he had previously accessed Skyler’s e-mail account and “erased ... all the dudes she had on there.” Gregory also directed Skyler’s brother to delete a message Skyler had posted on her online profile about being newly single. According to an individual who was incarcerated with Gregory during the period in which these calls were made, Gregory was jealous of Skyler, did not like the people she was spending time with, and stated that if he ever caught Skyler “cheating” on him, “he was going to blow her ... head off.”
Skyler began dating a new boyfriend, Daniel • Arthur Dyer, on July 4, 2007. Gregory was aware of Skyler’s new relationship with Daniel, but Gregory would continue to call for Skyler and, after his release from jail, would visit Skyler’s house several times per week. According to Skyler’s brother, Gregory would call and stop by to see Skyler “[a]t least three times a week ... [ujsually not invited.” Gregory and Skyler did, however, agree to go shopping together for their child’s birthday party, and, while he was still in jail, Gregory would discuss the child on the phone calls he placed.
On August 20, the day before the murders, Gregory, who was out of jail and on probation, spent the day with his brother and a few friends. While at one friend’s house, he test-fired a pistol that someone was trying to sell, possibly leaving gunshot residue on his hands, and while riding around with his brother and another friend, he used marijuana and crack cocaine and took pills. Sometime that afternoon, Gregory called Daniel’s cell phone, asking to speak to Skyler, who spent the day with Daniel and Daniel’s friend at Daniel’s house.
Starting at 10:19 p.m. that night, Gregory began making a number of outgoing phone calls, including several to Skyler’s house. At 10:26 p.m., an incoming call was made from Skyler’s house to Gregory’s house number, and there were then six additional outgoing calls from Gregory to Skyler’s house after the incoming call to Gregory went unanswered. At 11:31 and 11:32 p.m., Gregory- called the number for a taxicab company that was no longer in business.
*776 Gregory’s brother recalled seeing Gregory in their shared bedroom at approximately 8:00 or 3:30 a.m. in the early morning hours of August 21. Gregory was wet and mumbling about being down by the beach. Gregory later told his brother that he passed out at the beach and awoke with a wave washing up on him, that his shoes and wallet “got all soaked,” and that he then dove in the pool at a nearby condominium complex because he was “all ... sandy.”
At 4:17 a.m., Gregory called 911 to report himself for a probation violation as a result of his earlier drug use. A law enforcement officer informed Gregory that Gregory would have to take the matter up with his probation officer. Gregory’s brother and a friend said that they had used drugs with Gregory in the past and had never known him to self-report a probation violation.
Around 6 a.m. that morning, Skyler’s grandparents, who had been sleeping in the home during the murders, awoke to find Skyler and her boyfriend Daniel dead in Skyler’s bed. Skyler and Daniel had each suffered heavy head trauma caused by the firing of a shotgun at close range while they slept. Skyler’s father, who lived next door, called the authorities, and sheriffs deputies were dispatched to the home. On arrival, the deputies observed Skyler’s and Daniel’s bodies in a back bedroom, along with a shotgun and two shotgun shells lying on the floor in front of the bed. Skyler’s grandfather kept a shotgun and rifles, along with ammunition, in a house closet, which was usually left unlocked.
Gregory had previously lived with Skyler in that house, and the guns were kept in the same location during that time. A firearms analyst concluded that an individual would have to have been familiar with the particular shotgun used as the murder weapon in this case in order to load it because it was not a popular shotgun and was “quite different” in how it would be loaded. Gregory’s fingerprints were found on this shotgun.
After police had arrived at the home, Skyler’s brother called and left a message for Gregory at 7:26 a.m., stating, “You better run.” Gregory placed a 911 call at 8:24 a.m. to report this message to law enforcement and was taken by law enforcement to the Flagler County Sheriffs Office as a result of calling in the threat. Gregory was then arrested for a violation of probation based on his earlier admissions of using a controlled substance.
While at the sheriffs office, Gregory was tested for gunshot residue. The results were negative, although Gregory apparently thought that he had tested positive based on test-firing a pistol the prior day. Gregory subsequently placed a call to a friend from jail, telling her not to incriminate herself because the calls were recorded, and then explaining that law enforcement had taken magnet samples on his skin and reminding her that he “was popping off that pistol in the backyard” the previous day.
In subsequent phone calls, Gregory spoke to his mother and brother about the answers they were giving to law enforcement regarding his whereabouts at the time of the murders. In particular, Gregory questioned his mother about why she told investigators that she did not see him on the morning of August 21, and told her, “nobody’s helping me out.”
On August 25, Gregory was moved to a different housing facility. During this time, he was in the same cell block as an inmate who had been certified as a paralegal, and Gregory discussed his situation with this inmate. Gregory believed he had tested positive for gunshot residue and *777 seemed very surprised about this because he said that was one of the reasons he had jumped in a pool after the incident. Gregory told the inmate that he used a shotgun instead of a pistol, thinking there would be less gunshot residue, and figured he must have tested positive because of firing the pistol the day before the murders.
According to this inmate, Gregory knew Daniel and Skyler were together in Skyler’s house on August 21 because Gregory “said he was outside the house, like watching the house.” Gregory told the inmate that he “just couldn’t stand to see” Skyler with her new boyfriend and that the “worst part about it all was watching [Skyler] die.” Gregory also stated to the inmate that he was “frustrated because he couldn’t talk to his family on the phone because he knew that it was being recorded” and stated that his family members “were going to be his alibi.”
Gregory later spoke to a different inmate about his case. Gregory told this individual that it was “a joke” that the State was concerned about Gregory having walked to Skyler’s house on the night of the murders because it was “impossible for that to have happened.” Gregory stated that he had a ride that night and that he “did what he had to do.”
Gregory was subsequently indicted and tried for the murders of Skyler and Daniel. The jury found Gregory guilty of two counts of first-degree murder, one count of burglary, and one count of possession of a firearm by a convicted felon.
The Penalty Phase
During the penalty phase of Gregory’s trial, the State presented testimony from Gregory’s probation officer that Gregory was on felony probation at the time of the murders. Gregory called his sister and mother to testify. Gregory’s sister testified about Gregory’s history of drug use, lack of a relationship with his father, and his witnessing an incident during which she was raped when he was eight years old. Gregory’s mother testified about two head injuries Gregory suffered as a child and about the effect her abusive relationships with men and the rape incident involving Gregory’s sister had on Gregory.
By a vote of seven to five, the jury recommended that Gregory be sentenced to death for the murders of Skyler Dawn Meekins and Daniel Arthur Dyer. A Spencer[1] hearing was held thereafter, where the State presented victim impact testimony and Gregory’s sister briefly testified on his behalf.
In sentencing Gregory to death for both murders, the trial court found the following aggravating circumstances as to both victims: (1) the murders were committed by a person previously convicted of a felony who was on felony probation (moderate weight); (2) Gregory was previously convicted of a prior violent felony (very substantial weight);[2] (B) the murders were committed during the course of a burglary (moderate weight); and (4) the murders were committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification (CCP) (great weight). The trial court found one statutory mitigating circumstance — the murders were committed while Gregory was under the influence of extreme mental or emotional disturbance (slight weight)— and six nonstatutory mitigating circumstances.[3] Finding that the aggravating *778 circumstances far outweighed the mitigating circumstances, the trial court sentenced Gregory to death for both murders.
ANALYSIS
Gregory raises five issues on appeal,[4] three of which are related to evidentiary rulings made by the trial judge during the guilt phase. In addition to the issues raised by Gregory, this Court must consider whether the evidence was sufficient to support Gregory’s convictions and whether the death sentences are proportionate. We now address each issue.
Disqualification of the Trial Judge
The first issue Gregory raises is the trial court’s denial of his motion to disqualify the judge as legally insufficient. “A motion to disqualify is governed substantively by section 38.10, Florida Statutes ... and procedurally by Florida Rule of Judicial Administration 2.330.” Gore v. State, 964 So.2d 1257, 1268 (Fla.2007). The moving party must file an affidavit in good faith “stating fear that he or she will not receive a fair trial ... on account of the prejudice of the judge,” as well as “the facts and the reasons for the belief that any such bias or prejudice exists.” § 38.10, Fla Stat. (2011). “The judge against whom an initial motion to disqualify ... is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged.” Fla. R. Jud. Admin. 2.330(f).
“Whether the motion is legally sufficient requires a determination as to whether the alleged facts would create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial.” Rodriguez v. State, 919 So.2d 1252, 1274 (Fla.2005). “A motion to disqualify a judge ‘must be well-founded and contain facts germane to the judge’s undue bias, prejudice, or sympathy.’ ” Wright v. State, 857 So.2d 861, 873 (Fla.2003) (quoting Jackson v. State, 599 So.2d 103, 107 (Fla.1992)). “A mere ‘subjective fear[ ]’ of bias will not be legally sufficient; rather, the fear must be objectively reasonable.” Arbelaez v. State, 898 So.2d 25, 41 (Fla.2005) (quoting Fischer v. Knuck, 497 So.2d 240, 242 (Fla.1986)).
“If the motion is legally sufficient, the judge shall immediately enter an order granting disqualification and proceed no further in the action.” Fla. R. Jud. Admin. 2.330(f). However, “[i]f any motion is legally insufficient, an order denying the motion shall immediately be entered. No other reason for denial shall be stated, and an order of denial shall not take issue with the motion.” Id.
Whether the motion is legally sufficient is a question of law, and the standard of review of a trial judge’s determination of a motion to disqualify is de novo. Stein v. State, 995 So.2d 329, 334 (Fla.2008). Gregory argues that his motion to disqualify was legally sufficient because several of *779 the trial judge’s comments displayed a bias against him and furthered his belief that he would not receive a fair trial. We conclude that Gregory’s argument is without merit.
The alleged grounds for disqualification arose during a pretrial hearing regarding the admissibility of certain pieces of evidence the State intended to introduce at trial. Gregory argued that a statement he made eight months before the murders about killing “both of them” if his girlfriend ever cheated on him was too remote to be relevant. In response to this argument, the trial judge stated:
My reaction here is that this is not remote at all, that it’s — while there is some time delay — and if he is, in fact, the one who committed the murder, it is quite prophetic in terms of what’s going to happen. So, you know, we’re not talking about ten years or five years or three years. We’re talking about just months before the breakup and then the alleged murder happened later on.
Now, whether they can prove that he did this or not, that’s another matter, but it seems to me they are entitled to the benefit of trying to prove all the elements of the crime when one is premeditation, and this goes to that issue. So I’m going to ... allow it.
(Emphasis supplied.)
Gregory argues that the trial judge’s use of the word “prophetic” to describe the statement indicates that the judge had already determined that Gregory was guilty. We conclude that this argument is unavailing because Gregory focuses on one word out of context without including the trial judge’s actual statement. See generally Mansfield v. State, 911 So.2d 1160, 1170-71 (Fla.2005) (reading the trial judge’s statement in the context of the timing of a plea offer); Moore v. State, 820 So.2d 199, 206-07 (Fla.2002) (viewing the trial court’s ruling in the context of the order entered by the trial judge); Foster v. State, 778 So.2d 906, 917 (Fla.2000) (concluding, after a review of all the cited comments and the record as a whole, that the trial judge had not prejudged the case). When read as a whole, it is clear that the judge used the word “prophetic” in relation to the State’s argument that Gregory’s statement was relevant to the issue of premeditation. Indeed, the judge’s actual statement was that “if he [Gregory] is, in fact, the one who committed the murder, it is quite prophetic in terms of what’s going to happen.” (Emphasis supplied.)
In addition to the “prophetic” comment, Gregory’s disqualification motion also alleged that the trial judge demonstrated bias against him during a part of the same pretrial hearing concerning the admissibility of recorded telephone calls between Gregory and Skyler. Gregory alleged in his motion that the trial judge stated that hearing the victim’s voice would be “refreshing” because she “has now been silenced,” and that this constituted a legally sufficient basis for disqualification.
As it relates to this. comment, we begin by noting that Gregory’s disqualification motion and accompanying affidavit misstated the judge’s remarks.[5] At no point during the relevant part of the hearing did the judge use the word “refreshing.” Instead, the trial judge stated that he found it “quite interesting” that the jury would be able to hear the victim’s voice. The judge did not make any reference to Gregory being the one who “silenced” the vic *780 tim, nor did he comment on Gregory’s guilt or innocence.
Although trial counsel apparently did not intentionally misrepresent the judge’s comment but instead misheard the remarks, a motion made on a trial judge’s statement in open court that does not accurately represent what has actually been said cannot comply with the requirement that an affidavit be made “in good faith.” See § 38.10, Fla Stat. (2011). Further, for the motion to be legally sufficient, a mov-ant cannot simply pluck one word from a full sentence made by the trial judge and omit the remainder of the statement.
To the extent Gregory claims that the trial judge’s remarks may have produced an improper emotional response to prospective jurors, this argument is unavailing because the remarks were not made to the jury. Gregory appears to argue that the publication of these comments in the press created a public prejudice against him, and as support, he attached a newspaper article to his disqualification motion. However, Gregory raises no challenge to jury selection or composition or to pretrial publicity, and he provides no factual basis beyond the comments and news report attached to the motion itself to substantiate these claims.
Accordingly, because Gregory has not alleged any facts that “would create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial,” Rodriguez, 919 So.2d at 1274, we conclude that the trial court did not err as a matter of law in denying Gregory’s motion to disqualify.
Evidentiary Rulings
Gregory next raises three distinct challenges to evidentiary rulings made during the guilt phase of the trial. We address each claim in turn.

Admissibility of Statement Made by Gregory

First, Gregory contends that the trial court improperly admitted a statement made by Gregory eight months before the murder to a former co-worker that, if Gregory ever caught his girlfriend cheating on him, he would kill them both. The State contends that Gregory’s statement shows premeditation and intent to kill. We conclude that Gregory’s statement was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice, and the trial court therefore did not err in admitting this statement.
“This Court reviews evidentiary rulings for abuse of discretion. A judge’s discretion is limited by the rules of evidence and by the principles of stare deci-sis.” Johnson v. State, 969 So.2d 938, 949 (Fla.2007) (citation omitted). “Relevant evidence is evidence tending to prove or disprove a material fact.” § 90.401, Fla. Stat. (2011). “All relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2011).
Relevant evidence “is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat. (2011). “The trial court is obligated to exclude evidence in which unfair prejudice outweighs the probative value in order to avoid the danger that a jury will convict a defendant based upon reasons other than evidence establishing his guilt.” McDuffie v. State, 970 So.2d 312, 327 (Fla.2007).
The issue before the Court is whether the eight-month delay between Gregory’s statement and the murders lessens the statement’s relevance to the point that it should have been excluded from *781 evidence in this case. A review of Florida case law indicates that there is no bright-line rule regarding the point at which a prior statement is so remote as to become irrelevant. However, this Court has previously upheld as relevant to the issue of premeditation a defendant’s statement, made five months before the murder, that he intended to loll the victim. See LaMarca v. State, 785 So.2d 1209, 1215 (Fla.2001).
Gregory relies on a Nevada Supreme Court case stating that “events remote in time from the charged incident have less relevance in proving later intent.” Walker v. State, 116 Nev. 442, 997 P.2d 808, 806-07 (2000). Although that observation is generally accurate, the statements in the Nevada case were made six and ten years prior to the murder. Therefore, Walker is not helpful authority for Gregory, whose statement was made less than a year before the murders in this case. As to Gregory’s additional suggestion that his prior statement did not indicate an intent to kill because the threat was not taken seriously, that argument goes to the weight of the evidence, not its admissibility.
Even relevant evidence, though, must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. § 90.403, Fla. Stat. Gregory contends that the prejudice of implying from his statement an intent to kill is unduly prejudicial. However, this Court has previously upheld the admissibility of other relevant threatening statements similar to the one in this case. See Floyd v. State, 18 So.3d 482, 448 (Fla.2009); Dennis v. State, 817 So.2d 741, 762 (Fla.2002); Pittman v. State, 646 So.2d 167, 170-71 (Fla.1994).
Because Gregory’s prior statement provides evidence of his motive and intent in murdering his former girlfriend and her new boyfriend, and because the statement was not so remote in time as to have minimal probative value, we conclude that the trial court did not abuse its discretion in applying the applicable case law to the facts of this case to conclude that Gregory’s statement was admissible.

Admissibility of Testimony from Tyrone Graves

Gregory next argues that the trial court should have excluded testimony from Tyrone Graves, an individual who said he met and spoke with Gregory while the two were in jail at the same time, because Graves did not provide an in-court identification of Gregory. The State contends that the information Graves provided, including a physical description of Gregory and Gregory’s independently verified phone number, was sufficient to identify Gregory and establish the relevance of the testimony. We agree and conclude that there was no basis for excluding this testimony.
The sole issue Gregory raises with respect to this claim is Graves’s failure to identify Gregory in court when asked whether he saw Gregory in the courtroom. However, aside from objecting on general relevancy grounds, Gregory provides no basis to support his claim that Graves’s testimony about comments attributed to Gregory should have been excluded.
A review of the record shows that, even if an in-court identification was necessary under these circumstances, Graves provided a precise identification of Gregory as the person who uttered the remarks about which Graves testified. During his testimony, Graves offered a physical description of Gregory, which Gregory does not challenge. Further, Graves had previously given Gregory’s phone number, which Gregory provided to Graves during their time in jail together, to law enforcement, who independently verified its accuracy. Graves had also previously called the phone number and testified that he recog *782 nized the voice as the inmate he knew as Gregory.
In short, Gregory does not allege any facts, other than Graves’s failure to make an in-court identification, to indicate that the statements to which Graves testified were not made by Gregory and that this testimony was therefore not relevant. In addition, even if there is any question regarding whether Graves correctly identified Gregory as the one who made the statements, that issue goes to the weight of the testimony, not its admissibility.
Accordingly, this testimony was relevant and the trial court did not err in admitting the testimony.

Double Hearsay

In his third and final challenge to the evidentiary rulings made at trial, Gregory argues that testimony regarding a statement he allegedly made to Daniel Dyer, one of the victims, should have been excluded as inadmissible hearsay evidence. The State counters that the testimony was admissible based on an exception to the hearsay rule or, alternatively, that a proper non-hearsay use existed. The statement at issue, in which Gregory told Daniel either, “I want to personally thank you for ruining my life,” or “I personally want to thank you for ruining my family,” was presented at trial by two State witnesses, who testified that Daniel told them about a conversation during which Gregory made the statement. Accordingly, this is an issue involving two levels of hearsay — the original statement made from Gregory to Daniel, and Daniel’s discussion of that statement to the two witnesses, who then relayed it at trial.
We conclude that error, if any, in the admission of this testimony was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). In determining whether an error was harmful, the focus is on the effect that the error has upon the trier-of-fact. Williams v. State, 863 So.2d 1189, 1190 (Fla.2003). In other words, “[t]he question is whether there is a reasonable possibility that the error affected the verdict.” Id. (quoting DiGuilio, 491 So.2d at 1139). “If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.” Id. (quoting DiGuilio, 491 So.2d at 1139). Critically, the test is not whether there is other evidence, or even overwhelming evidence, of guilt. See DiGuilio, 491 So.2d at 1139 (“The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test.”).
We conclude that there is no reasonable possibility that any error in the admission of this testimony affected either the verdict of guilt or the imposition of the death penalty in this case. Unlike Gregory’s other statements, including his statement made months before the murder that if he ever found his girlfriend cheating on him, he would “kill both of them,” and his numerous statements made to Skyler’s brother showing an obsession about Skyler and any new relationship she might have, as well as Gregory’s constant phone calls and visits, Gregory’s alleged statement to the victim was not a threat of harm and at most is simply additional evidence that Gregory knew that the victim was dating his former girlfriend. We conclude that under these circumstances, there is therefore no reasonable possibility that any error regarding this testimony affected the verdict in this case.
CCP
The fifth and final issue Gregory raises on appeal is the trial court’s *783 finding of the CCP aggravator. “The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence.” Guardado v. State, 965 So.2d 108, 115 (Fla.2007). “When reviewing a trial court’s finding of an aggravator, ‘it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.’ ” Aguirre-Jarquin v. State, 9 So.3d 593, 608 (Fla.2009) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). Rather, it is this Court’s task on appeal “to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Id.
To establish the CCP aggravator,
the evidence must show: (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold);” (2) “the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated);” (3) “the defendant exhibited heightened premeditation (premeditated);” (4) “the defendant had no pretense of moral or legal justification.”
Williams v. State, 37 So.3d 187, 195 (Fla.2010) (quoting Franklin v. State, 965 So.2d 79, 98 (Fla.2007)). “ ‘CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2000)). “Premeditation can be established by examining the circumstances of the killing and the conduct of the accused.” Williams, 37 So.3d at 195 (quoting Franklin, 965 So.2d at 98). “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’ ” Franklin, 965 So.2d at 98 (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)). “Further, ‘the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began.’ ” Williams, 37 So.3d at 195 (quoting Thompson v. State, 565 So.2d 1311, 1318 (Fla.1990)).
In finding that CCP had been proven beyond a reasonable doubt, the trial court stated in relevant part:
In this case Mr. Gregory, on separate occasions, months before the murders ... said he would blow her head off and he would kill both she and any new boyfriend she might have if Skyler Dawn Meekins cheated on him. Consistent with this plan, Mr. Gregory became aware of Ms. Meekins’ new love interest, Daniel Arthur Dyer. Having been unsuccessful at winning her back, he put his plan in action....
Once at the residence he entered the house surreptitiously, located a 12-guage [sic] shotgun in a closet, located the shotgun shells on a shelf in the closet and loaded just two shells into the shotgun which was a weapon that was described as a difficult weapon to load. Mr. Gregory, at this point fully armed with a loaded weapon, passed by the separate rooms of Skyler Meekins’ grandmother and grandfather and went to the sleeping room which Skyler Mee-kins occupied where she and Daniel Dyer were cuddling while sleeping. It has been clearly established, without refutation, that he placed the loaded weapon at point blank range and aimed at the heads of the respective victims *784 where he killed each of them in execution style with devastating shots to the heads of both victims in an act that was totally consistent with his earlier announced plan.
Gregory argues that there was not competent, substantial evidence to support the trial court’s finding of this aggravator. We disagree.
This Court has previously explained, in describing the “cold,” “calculated,” and “premeditated” elements of CCP, that
execution-style killing is by its very nature a “cold” crime. As to the “calculated” element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of calculated is supported. This Court has “previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder.”
Pearce v. State, 880 So.2d 561, 576 (Fla.2004) (citations omitted) (quoting Alston v. State, 723 So.2d 148, 162 (Fla.1998)).
Gregory contends that the murders in this case were not the product of cool and calm reflection because he did not bring a weapon to the home. He also asserts that the evidence is devoid of any premeditated plan to kill and instead suggests that the murders were committed in a heat of passion after discovering the victims in bed together. These arguments are unavailing.
Although Gregory argues that the killings were committed in the heat of passion, inconsistent with the “cold” and “calculated” elements of CCP, the uncontested evidence presented at trial demonstrated that the victims were shot and killed execution-style from point blank range while sleeping and defenseless in the middle of the night. As the Court stated in Pearce and has affirmed on numerous occasions, an execution-style killing is by nature a “cold” killing and can support a finding of “calculated” as well. See, e.g., Wright v. State, 19 So.3d 277, 299 (Fla.2009) (“By their very nature, execution-style killings satisfy the cold element of CCP.”); Lynch v. State, 841 So.2d 362, 372-73 (Fla.2003) (explaining that execution-style killings provide support for the “calculated” element of CCP). Further, we reject Gregory’s argument that because he did not bring a weapon to the home, he necessarily must not have had a heightened premeditated plan to kill. Having previously lived in the house, Gregory knew where the weapons were located, and this Court has never required as a prerequisite for finding CCP that the defendant bring a weapon to the crime scene. See Buzia v. State, 926 So.2d 1203, 1215-16 (Fla.2006).
On the night of the crime, fully aware of Skyler’s new relationship with Daniel and having been unsuccessful at winning her back, Gregory traveled to Skyler’s house, obtained and loaded the specific murder weapon, and walked past other residents sleeping in the home in order to enter Skyler’s bedroom. Testimony presented at trial indicates that Gregory knew Skyler and Daniel were together that day and that he was outside watching the house before he entered. Competent, substantial evidence therefore supports the trial court’s finding that Gregory had a heightened premeditated plan, which was cold, calculated, and lacking in any moral or legal justification.
Accordingly, we conclude that the trial court did not err in finding the CCP ag-gravator with respect to the murders of Skyler Meekins and Daniel Dyer.
*785 Sufficiency of the Evidence
Although Gregory does not raise the issue, this Court has a mandatory obligation to review the sufficiency of the evidence in every ease in which a sentence of death has been imposed, even when not challenged. See Jones v. State, 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(5) (“On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
We conclude that the record in this case contains sufficient evidence to support Gregory’s convictions for the first-degree murders of Skyler Meekins and Daniel Dyer. The State presented evidence that Gregory made statements in the months prior to the homicides in which he threatened to kill Skyler and anyone with whom she “cheated” on him, as well as testimony that Gregory knew Skyler had begun seeing Daniel. In addition, the State demonstrated through the litany of recorded phone calls it published to the jury how jealous and obsessive Gregory was about Skyler leaving him, and the State presented testimony that Gregory knew Daniel and Skyler were together on the night of the murders.
Gregory’s fingerprints were found on the murder weapon. He self-reported a probation violation, which was unusual for him and seemingly done in an attempt to create an alibi, and he attempted to remove traces of gunshot residue and DNA by going swimming after the crime. The State also showed through inconsistent statements, recorded phone calls, and the testimony of a jailhouse witness that Gregory tried to influence his family’s statements to law enforcement about his whereabouts on the night of the crime. He also admitted the murders to other inmates after the crime.
Based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons, 934 So.2d at 1111. Thus, we conclude that there was sufficient evidence to support Gregory’s convictions.
Proportionality
This Court also reviews a death sentence for proportionality “regardless of whether the issue is raised on appeal.” England v. State, 940 So.2d 389, 407 (Fla.2006); see also Fla. R.App. P. 9.142(a)(5). “The death penalty is ‘reserved only for those cases where the most aggravating and least mitigating circumstances exist.’ ” Silvia v. State, 60 So.3d 959, 973 (Fla.2011) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). “Therefore, in deciding whether death is a proportionate penalty, the Court makes a ‘comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Id. (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). Accordingly, the Court “considers] the totality of the circumstances of the case and compare[s] the case to other capital cases.” Offord v. State, 959 So.2d 187, 191 (Fla.2007). “This analysis ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Silvia, 60 So.3d at 973 (quoting Porter v. State, 564 *786 So.2d 1060, 1064 (Fla.1990)). “Rather, this entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Id. (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). “In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors.” Id.
In this case, the trial court found four aggravating circumstances as applied to both murders: (1) Gregory was on felony probation (assigned moderate weight); (2) Gregory was previously convicted of a pri- or violent felony (assigned very substantial weight); (3) the murders were committed during the course of a burglary (assigned moderate weight); and (4) Gregory committed the murders in a CCP manner (assigned great weight). The trial court found one statutory mitigating factor — extreme mental or emotional disturbance— and six nonstatutory mitigating circumstances.
We conclude that the death sentences in this case are proportionate. The aggravating circumstances in this case and the small weight assigned to mitigation are similar to Carter v. State, 980 So.2d 473, 477-78 (Fla.2008), which is a case that, like this case, involved the shooting deaths of the defendant’s former girlfriend and her new boyfriend. In Carter, the Court upheld the death sentences as proportionate in light of CCP, the prior violent felony aggravator for contemporaneous murders, and the additional aggravator of commission in the course of a burglary. Id. at 485-86. Further, the death sentences in this case are proportionate in relation to other cases with similar aggravating and mitigating circumstances. See Deparvine, 995 So.2d at 381-83 (upholding death sentence as proportionate in light of four aggravators (contemporaneous murder convictions, CCP, under sentence of imprisonment, and pecuniary gain) and little weight assigned to mitigating circumstances); Winkles v. State, 894 So.2d 842, 847-48 (Fla.2005) (upholding death sentences as proportionate in light of four aggravators (prior violent felony, CCP, avoiding arrest, and commission during a kidnapping) and four nonstatutory miti-gators); Dennis v. State, 817 So.2d 741, 767 (Fla.2002) (upholding death sentences as proportionate, in case involving the murders of the defendant’s ex-girlfriend and her new boyfriend, in light of four aggravators (prior violent felony for contemporaneous murders; CCP; commission during the course of a burglary; and heinous, atrocious, or cruel), the extreme emotional disturbance statutory mitigator, and no significant weight assigned to mitigation).
Gregory nevertheless asserts that this case is identical to Farinas v. State, 569 So.2d 425, 431 (Fla.1990), where the Court reversed the trial court’s finding of CCP and held that the death sentence was disproportionate. However, this argument is unavailing for several reasons. First, although the statutory mitigating circumstance of extreme mental or emotional disturbance was applicable in Farinas, as it is in this case, part of the Court’s reasoning for finding the death penalty disproportionate in Fannas was its striking of the CCP aggravator. See id. In this case, we have upheld the finding of CCP.
Second, this case involves two of the most serious aggravators set forth in the statutory sentencing scheme — CCP and prior violent felony. See Silvia, 60 So.3d at 974. The prior violent felony in this case is the contemporaneous murder, and the trial court assigned this factor very substantial weight.
*787 Third, although Gregory points to the murder in Farinas being the result of a heated domestic confrontation, Farinas, 569 So.2d at 431, this Court has repeatedly emphasized since Farinas that there is no special proportionality exception for domestic disputes. See Silvia, 60 So.3d at 974; Carter, 980 So.2d at 485; Lynch v. State, 841 So.2d 362, 377 (Fla.2003). Further, there was no heated domestic confrontation in this case, but instead the execution-style killings of two sleeping victims.
Accordingly, we conclude that Gregory’s death sentences are proportionate.
CONCLUSION
After a thorough review of all the issues raised by Gregory, and after an independent review of the sufficiency of the evidence and the proportionality of the sentences, we affirm Gregory’s convictions for first-degree murder, burglary, and possession of a firearm by a convicted felon, and we also affirm the sentences of death.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court used the contemporaneous murders to support the prior violent felony aggravator.

. The nonstatutory mitigating circumstances were: (1) Gregory had a longstanding drug problem (slight weight); (2) Gregory grew up without his father and was raised by his *778 mother (slight weight); (3) in his childhood, Gregory was forced to witness sexual abuse (slight weight); (4) Gregory had a dysfunctional childhood (slight weight); (5) Gregory was impaired at the time of the crime due to the ingestion of drugs, alcohol, or both; and (6) Gregory was employed and was a good worker (slight weight).

. Gregory argues on appeal that (1) the trial court erred in denying his motion to disqualify the judge based on statements the judge made during a pretrial hearing; (2) the trial court erred in admitting into evidence threatening statements directed toward the victims made eight months before the murders by Gregory to a co-worker; (3) the trial court erred in admitting testimony from a witness who could not identify Gregory in court; (4) the trial court erred in admitting testimony about a statement Gregory made to one of the victims; and (5) the trial court erred in instructing the jury on and in finding CCP.

. Apparently, the misstatement was not intentional, but the motion for disqualification was filed before counsel had obtained a copy of the actual transcript.