# Supreme Court of Florida

_____

No. SC15-1663
_____

**WILLIAM A. GREGORY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-183
_____

**WILLIAM A. GREGORY,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[August 31, 2017]

PER CURIAM.

William A. Gregory appeals an order of the circuit court denying his motion

to vacate his convictions of first-degree murder and sentences of death filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's order denying postconviction relief as to the guilt phase. However, we reverse the death sentences and remand for a new penalty phase based on Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017), and Mosley v. State, 209 So. 3d 1248, 1268 (Fla. 2016), because the jury's nonunanimous recommendation of death by a vote of seven to five as to both murders, is not harmless beyond a reasonable doubt, for reasons more fully explained below. We also deny Gregory's habeas petition except to the extent he seeks relief pursuant to Hurst. Finally, we affirm the postconviction court's denial of Gregory's Successive Motion to Vacate Judgment and Sentence (Newly Discovered Evidence).

## FACTS AND PROCEDURAL BACKGROUND

The facts of the underlying murders and criminal trial were described in this Court's opinion on direct appeal:

William A. Gregory, who was twenty-four years old when the murders were committed, was for a time involved in a romantic relationship with Skyler Dawn Meekins, who was seventeen at the time she was murdered. Skyler and Gregory had a child together, although their romantic relationship ended in June 2007. Skyler and Gregory both continued, however, to participate in raising their child.
Around the time their relationship ended, Gregory was in jail and would often call Skyler's house. On several occasions, he spoke with Skyler's brother, and the two would discuss Skyler's whereabouts and activities. During one call, Gregory said he was

- 2 -

"stressing about Skyler" and asked for information regarding any other men who might be calling for Skyler. Gregory stated that he knew Skyler was "trying to . . . get with dudes" and indicated that he would have to "kind of try to get over Skyler or something."

During another call, Gregory asked Skyler's brother to check Skyler's e-mail account and online profile for other men with whom she might be communicating. Gregory told Skyler's brother that he had previously accessed Skyler's e-mail account and "erased . . . all the dudes she had on there." Gregory also directed Skyler's brother to delete a message Skyler had posted on her online profile about being newly single. According to an individual who was incarcerated with Gregory during the period in which these calls were made, Gregory was jealous of Skyler, did not like the people she was spending time with, and stated that if he ever caught Skyler "cheating" on him, "he was going to blow her . . . head off."

Skyler began dating a new boyfriend, Daniel Arthur Dyer, on July 4, 2007. Gregory was aware of Skyler's new relationship with Daniel, but Gregory would continue to call for Skyler and, after his release from jail, would visit Skyler's house several times per week. According to Skyler's brother, Gregory would call and stop by to see Skyler "[a]t least three times a week . . . [u]sually not invited." Gregory and Skyler did, however, agree to go shopping together for their child's birthday party, and, while he was still in jail, Gregory would discuss the child on the phone calls he placed.

On August 20, the day before the murders, Gregory, who was out of jail and on probation, spent the day with his brother and a few friends. While at one friend's house, he test-fired a pistol that someone was trying to sell, possibly leaving gunshot residue on his hands, and while riding around with his brother and another friend, he used marijuana and crack cocaine and took pills. Sometime that afternoon, Gregory called Daniel's cell phone, asking to speak to Skyler, who spent the day with Daniel and Daniel's friend at Daniel's house.

Starting at 10:19 p.m. that night, Gregory began making a number of outgoing phone calls, including several to Skyler's house. At 10:26 p.m., an incoming call was made from Skyler's house to Gregory's house number, and there were then six additional outgoing calls from Gregory to Skyler's house after the incoming call to Gregory went unanswered. At 11:31 and 11:32 p.m., Gregory called the number for a taxicab company that was no longer in business.

Gregory's brother recalled seeing Gregory in their shared bedroom at approximately 3:00 or 3:30 a.m. in the early morning hours of August 21. Gregory was wet and mumbling about being down by the beach. Gregory later told his brother that he passed out at the beach and awoke with a wave washing up on him, that his shoes and wallet "got all soaked," and that he then dove in the pool at a nearby condominium complex because he was "all . . . sandy."

At 4:17 a.m., Gregory called 911 to report himself for a probation violation as a result of his earlier drug use. A law enforcement officer informed Gregory that Gregory would have to take the matter up with his probation officer. Gregory's brother and a friend said that they had used drugs with Gregory in the past and had never known him to self-report a probation violation.

Around 6 a.m. that morning, Skyler's grandparents, who had been sleeping in the home during the murders, awoke to find Skyler and her boyfriend Daniel dead in Skyler's bed. Skyler and Daniel had each suffered heavy head trauma caused by the firing of a shotgun at close range while they slept. Skyler's father, who lived next door, called the authorities, and sheriff's deputies were dispatched to the home. On arrival, the deputies observed Skyler's and Daniel's bodies in a back bedroom, along with a shotgun and two shotgun shells lying on the floor in front of the bed. Skyler's grandfather kept a shotgun and rifles, along with ammunition, in a house closet, which was usually left unlocked.

Gregory had previously lived with Skyler in that house, and the guns were kept in the same location during that time. A firearms analyst concluded that an individual would have to have been familiar with the particular shotgun used as the murder weapon in this case in order to load it because it was not a popular shotgun and was "quite different" in how it would be loaded. Gregory's fingerprints were found on this shotgun.

After police had arrived at the home, Skyler's brother called and left a message for Gregory at 7:26 a.m., stating, "You better run." Gregory placed a 911 call at 8:24 a.m. to report this message to law enforcement and was taken by law enforcement to the Flagler County Sheriff's Office as a result of calling in the threat. Gregory was then arrested for a violation of probation based on his earlier admissions of using a controlled substance.

While at the sheriff's office, Gregory was tested for gunshot residue. The results were negative, although Gregory apparently

thought that he had tested positive based on test-firing a pistol the prior day. Gregory subsequently placed a call to a friend from jail, telling her not to incriminate herself because the calls were recorded, and then explaining that law enforcement had taken magnet samples on his skin and reminding her that he "was popping off that pistol in the backyard" the previous day.

In subsequent phone calls, Gregory spoke to his mother and brother about the answers they were giving to law enforcement regarding his whereabouts at the time of the murders. In particular, Gregory questioned his mother about why she told investigators that she did not see him on the morning of August 21, and told her, "nobody's helping me out."

On August 25, Gregory was moved to a different housing facility. During this time, he was in the same cell block as an inmate who had been certified as a paralegal, and Gregory discussed his situation with this inmate. Gregory believed he had tested positive for gunshot residue and seemed very surprised about this because he said that was one of the reasons he had jumped in a pool after the incident. Gregory told the inmate that he used a shotgun instead of a pistol, thinking there would be less gunshot residue, and figured he must have tested positive because of firing the pistol the day before the murders.

According to this inmate, Gregory knew Daniel and Skyler were together in Skyler's house on August 21 because Gregory "said he was outside the house, like watching the house." Gregory told the inmate that he "just couldn't stand to see" Skyler with her new boyfriend and that the "worst part about it all was watching [Skyler] die." Gregory also stated to the inmate that he was "frustrated because he couldn't talk to his family on the phone because he knew that it was being recorded" and stated that his family members "were going to be his alibi."

Gregory later spoke to a different inmate about his case. Gregory told this individual that it was "a joke" that the State was concerned about Gregory having walked to Skyler's house on the night of the murders because it was "impossible for that to have happened." Gregory stated that he had a ride that night and that he "did what he had to do."

Gregory was subsequently indicted and tried for the murders of Skyler and Daniel. The jury found Gregory guilty of two counts of

first-degree murder, one count of burglary, and one count of possession of a firearm by a convicted felon.

The Penalty Phase

During the penalty phase of Gregory's trial, the State presented testimony from Gregory's probation officer that Gregory was on felony probation at the time of the murders. Gregory called his sister and mother to testify. Gregory's sister testified about Gregory's history of drug use, lack of a relationship with his father, and his witnessing an incident during which she was raped when he was eight years old. Gregory's mother testified about two head injuries Gregory suffered as a child and about the effect her abusive relationships with men and the rape incident involving Gregory's sister had on Gregory.

By a vote of seven to five, the jury recommended that Gregory be sentenced to death for the murders of Skyler Dawn Meekins and Daniel Arthur Dyer. A Spencer[1] hearing was held thereafter, where the State presented victim impact testimony and Gregory's sister briefly testified on his behalf.

In sentencing Gregory to death for both murders, the trial court found the following aggravating circumstances as to both victims: (1) the murders were committed by a person previously convicted of a felony who was on felony probation (moderate weight); (2) Gregory was previously convicted of a prior violent felony (very substantial weight); (3) the murders were committed during the course of a burglary (moderate weight); and (4) the murders were committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification (CCP) (great weight). The trial court found one statutory mitigating circumstance—the murders were committed while Gregory was under the influence of extreme mental or emotional disturbance (slight weight)—and six nonstatutory mitigating circumstances. Finding that the aggravating circumstances far outweighed the mitigating circumstances, the trial court sentenced Gregory to death for both murders.

Gregory v. State, 118 So. 3d 770, 775-78 (Fla. 2013) (footnotes omitted).

---

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

On direct appeal, Gregory raised five issues: (1) the trial court erred in denying his motion to disqualify the judge based on statements the judge made during a pretrial hearing; (2) the trial court erred in admitting into evidence threatening statements directed toward the victims made by Gregory to a co-worker eight months before the murders; (3) the trial court erred in admitting testimony from a witness who could not identify Gregory in court; (4) the trial court erred in admitting testimony about a statement Gregory made to one of the victims; and (5) the trial court erred in instructing the jury on and in finding CCP. Id. at 778 n.4. This Court denied Gregory relief on all claims and additionally found that the evidence was sufficient to support Gregory's first-degree murder convictions and that Gregory's death sentences were proportionate. Id. at 787.

Gregory filed a timely Motion to Vacate Judgment and Sentence pursuant to Rule 3.851, raising twelve claims:

> Claim I: Gregory received ineffective assistance of trial counsel during the guilt phase of his capital trial in violation of his Fifth, Sixth, Eight [sic], and Fourteenth Amendment rights due to trial counsel's failure to properly rebut the State's theory of prosecution, that he was motivated by jealous anger;
> Claim II: Gregory received ineffective assistance of trial counsel during the guilt phase of his capital trial in violation of his Fifth, Sixth, Eight [sic], and Fourteenth Amendment rights due to trial counsel's failure to present the testimony of Sheri Meekins;
> Claim III: Trial counsel provided ineffective assistance of counsel by failing to properly impeach State witness [sic] Patrick Giovine and Tyrone Graves. As a result of trial counsel's deficient performance, Mr. Gregory was deprived of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the

Constitution of the United States and of his corresponding rights pursuant to the Declaration of Rights under the Constitution of the State of Florida;

Claim IV: Trial counsel provided ineffective assistance of counsel by failing to correct a wrongly transcribed word found in State's exhibit #73 and stipulating to the transcript's accuracy at trial, thereby violating Mr. Gregory's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and of his corresponding rights pursuant to the Declaration of Rights under the Constitution of the State of Florida;

Claim V: Trial counsel provided ineffective assistance of counsel by failing to review and investigate all of Mr. Gregory's juvenile justice records independently obtained by the Court and relied upon during the sentencing decision, thereby violating Mr. Gregory's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and of his corresponding rights pursuant to the Declaration of Rights under the Constitution of the State of Florida;

Claim VI: Gregory received ineffective assistance of trial counsel during the penalty phase of his capital trial in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States and of his corresponding rights pursuant to the Declaration of Rights under the Constitution of the State of Florida;

Claim VII: Florida's capital sentencing structure is unconstitutional, and couches an ineffectiveness claim therein;

Claim VIII: Ring v. Arizona, 536 U.S. 584 (2002), including an ineffectiveness sub-claim;

Claim IX: Cumulative error;

Claim X: Lethal Injection constitutes cruel and unusual punishment;

Claim XI: Gregory is entitled to know the identity of the execution team members; and

Claim XII: Competency at the time of execution.

The trial court issued an order on January 27, 2015, granting an evidentiary hearing on Claims I through VI. Claims VII and VIII were summarily denied.

Claims IX through XII were ruled on as a matter of law at the conclusion of the hearing.

An evidentiary hearing was held in which Gregory presented witnesses—Leigha Weber Furmanek, Gregory's younger sister; Mary Lou Wilson, Gregory's maternal grandmother; and Lynda Wilson, f/k/a Lynda Probert, Gregory's mother—all of whom supported his claim that his counsel was ineffective in the guilt phase for failure to rebut the State's theory that Gregory's motive for the murder was jealousy.

After the evidentiary hearing, the trial court issued an order denying all of Gregory's postconviction claims. Gregory filed a notice of appeal in this Court. Shortly thereafter, Gregory filed a successive postconviction motion in the circuit court alleging newly discovered evidence. Specifically, Gregory's motion was based on the affidavit of State witness, Patrick Giovine, which purports to recant the testimony Giovine gave during Gregory's original guilt phase trial. This Court relinquished jurisdiction for the trial court to consider this motion.

Without an evidentiary hearing, the circuit court issued an order denying Gregory's successive postconviction motion based on newly discovered evidence. The postconviction court found that although Giovine's statement appeared to be a recantation of his prior testimony, the recantation would not have led to an acquittal or lesser sentence for Gregory in light of the evidence presented against

him. Moreover, the postconviction court noted that the trial court did not rely on Giovine's testimony in its sentencing order. Gregory subsequently filed an amended notice of appeal in this Court, also challenging the postconviction court's denial of his successive postconviction motion.

As we discuss below, we affirm the denial of the guilt phase claims and affirm the denial of the newly discovered evidence claim. Because we conclude that Gregory is entitled to Hurst relief, we decline to address his penalty phase claims.[2]

### Guilt Phase Claims

Gregory argues that his guilt phase counsel was ineffective for five reasons: (1) his failure to rebut the State's theory of prosecution; (2) his failure to call Sherri Meekins as a defense witness; (3) his failure to impeach the testimony of Patrick Giovine and Tyronne Graves; (4) his failure to object to an erroneous transcription of a jailhouse phone call; and (5) cumulative error.

---

2. We deny Gregory's claims related to method of execution and identity of executioners. See, e.g., Allred v. State, 186 So. 3d 530, 542-43 (Fla. 2016) (rejecting defendant's claim that he was constitutionally entitled to know the identity of his execution team and explaining that identity of executioners was not ascertainable because Governor had not signed death warrant); Muhammad v. State, 132 So. 3d 176, 205 (Fla. 2013) (explaining that "section 945.10(g), Florida Statutes (2013), makes the identity of the executioner and any persons preparing, dispensing or administering lethal injection confidential"); Power v. State, 886 So. 2d 952, 958 (Fla. 2004) (rejecting Power's claim that his execution is constitutionally prohibited because Power was insane as premature).

Following the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), this Court has explained that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

<u>Schoenwetter v. State</u>, 46 So. 3d 535, 546 (Fla. 2010) (quoting <u>Maxwell v. Wainwright</u>, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted)).

To establish the deficiency prong under <u>Strickland</u>, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." <u>Morris v. State</u>, 931 So. 2d 821, 828 (Fla. 2006) (quoting <u>Strickland</u>, 466 U.S. at 688). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689.

As to the prejudice prong of <u>Strickland</u>, this Court has explained:

> "<u>Strickland</u> places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." <u>Wong v. Belmontes</u>, 558 U.S. 15 (2009) (quoting <u>Strickland</u>, 466 U.S. at 694). <u>Strickland</u> does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " <u>Porter v.</u>

McCollum, 558 U.S. 30 (2009) (quoting Strickland, 466 U.S. at 693-94). This Court employs a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

Mosley, 209 So. 3d at 1264 (citing Smith v. State, 126 So. 3d 1038, 1042-43 (Fla. 2013)).

"[U]nder Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings." Eaglin v. State, 176 So. 3d 900, 906 (Fla. 2015) (quoting Stephens v. State, 748 So. 2d 1028, 1033 (Fla. 1999)).

### 1. Failure to Rebut the State's Theory of Prosecution

Gregory contends that his attorney was ineffective because he failed to rebut the State's theory that he was a jealous ex-lover through the use of testimony and photographs depicting Gregory's continued relationship with the victim, Skyler Meekins, in the months preceding her death. As to claim one, the postconviction court found:

> Mr. Gregory alleges trial counsel was ineffective due to his failure to rebut the State's theory that the Defendant was motivated by jealous anger. Counsel did offer evidence of the more favorable side to Mr. Gregory, and the victim, Skylar [sic] Meekins' relationship through the testimony of Leigha Furmanek, Mary Lou Wilson and Lynda Wilson, f/k/a Lynda Probert. Leigha testified in both the guilt and penalty phases of trial. At the evidentiary hearing she testified she had known Skylar [sic] Meekins for approximately twelve years and considered her a friend. Her brother, William Gregory, was in jail during most of June 2007. Leigha recalls going to Skylar's [sic]

- 12 -

house and seeing her write letters to Mr. Gregory in jail, also that they spoke on the phone a lot. Leigha felt that they still cared about each other and weren't on bad terms. Mr. Gregory and Ms. Meekins had a child together who was not yet one at that time. During the months of June, July and August 2007 Ms. Meekins and Mr. Gregory had spent the night together at Leigha's house and had gone to a barbeque there. When Leigha bonded Mr. Gregory out of jail that July she had dropped her brother off at Skylar's[sic] house; she had talked to Skylar[sic] who asked her to bring him there. During July and August 2007 Mr. Gregory and Ms. Meekins had "a lot of contact" because they were planning their daughter's first birthday on July 31, 2007. Around that time Mr. Gregory advised Leigha that Ms. Meekins was dating someone else and that he was "okay with that." This was along the same lines as Leigha's trial testimony.

Mr. Gregory's grandmother, Mary Ann Wilson and mother, Lynda Wilson also both testified at the trial that Gregory was still on and off with Skylar [sic] and she had spent the night at the Wilson's home, with Mr. Gregory. They were aware that Skylar [sic] was also dating Dan Dyer, but she and Mr. Gregory continued to see each other. Their testimony at the evidentiary hearing was consistent with that presented at the trial.

Mr. Wood testified that he made a strategic decision to omit some things from the jury such as pictures of Mr. Gregory and Ms. Meekins, and jail phone calls between them. The concern he had was the negative impact it would have on the jury due to victim impact concerns in death penalty cases. Attorney Wood decided not to put on the happy pictures of them shopping and having a birthday party for their daughter. He feared the jury would compare them to the pictures of the crime scene, and that it would have a negative impact on his client. Also on the phone calls when Mr. Gregory would get "lovey-dovey" Skylar [sic] Meekins would turn the conversation away to Kyla, their daughter. It appeared from the phone calls that Mr. Gregory was the pursuer, while Ms. Meekins, while accepting the calls, is not reengaging him.

It appears from the record that Attorney Wood's investigation was thorough; his trial strategy well-reasoned. This court finds counsel was neither deficient nor prejudicial pursuant to the Strickland test.

(Record citations omitted).

We conclude that the trial court's factual findings are supported by competent, substantial evidence and that the conclusions as to deficiency and prejudice, along with its conclusions regarding the reasonable strategic decisions of counsel are factually and legally sound. This Court has explained "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). From the testimony presented, it is clear that Attorney Wood was aware of the photographs, jailhouse phone calls, and the additional testimony that other witnesses could have provided that Gregory contends should have been admitted to rebut the State's theory.

Moreover, as the postconviction court stated, Attorney Wood explained his trial strategy in relation to the photographs and jailhouse phone calls during the postconviction evidentiary hearing. Attorney Wood stated that he considered admitting the evidence to rebut the State's theory but ultimately decided against it fearing that it would constitute an indirect form of victim impact evidence. Additionally, as the postconviction court stated in its order, the jailhouse phone calls did not depict Gregory in the best light, showing his attempts to show affection to Skyler and her obvious rejection of Gregory, a point that would have served to favor the State's theory in this case that Gregory was a rebuked, jealous

ex-lover.  Attorney Wood's actions do not appear unreasonable in light of the circumstances.  Accordingly, we conclude that Attorney Wood was not deficient in this respect, and the postconviction court correctly denied this claim.

We also conclude that Gregory was not prejudiced by Attorney Wood's strategic decision.  The jury heard and considered testimony and evidence that suggested Skyler and Gregory maintained an amicable relationship up to the time of the murders.  The evidence presented at the postconviction evidentiary hearing through the photographs and testimony detailing Gregory and Meekins' ongoing relationship the summer before her death was largely cumulative to the evidence that was presented during the trial.  During the trial, both Gregory's grandmother, Mary Ann Wilson, and Gregory's mother, Lynda Wilson, testified that Gregory was still on and off with Skyler and she had spent the night at the Wilson's home, with Gregory.  They also testified that they were aware Skyler was dating Dan Dyer, even though she and Gregory continued to see each other.  More importantly, the additional evidence could have led the jury to compare the photos of Meekins alive and well with those of the crime scene, and could have further highlighted to the jury that Skyler's one-year-old child was now without a mother.  This is exactly what Attorney Wood feared.

Accordingly, Gregory is not entitled to relief on this claim.

## 2. Failure to Present the Testimony of Sherri Meekins

Next, Gregory contends that his guilt phase counsel was ineffective because he failed to present the testimony of the victim's stepmother, Sherri Meekins, which included information inconsistent with the State's theory of the case. The postconviction court denied relief on this claim, stating:

> Trial counsel testified that he did not call Sherri Meekins because she was "a loose cannon." Although she could have offered testimony concerning the possibility of Mr. Gregory handling the murder weapon her testimony would have been a two-edged sword. Sherri Meekins could also testify that Mr. Gregory had called her earlier in the day and indicated to her, the victim's stepmother, that he would be at the property to see Skylar[sic] Meekins around the time of the murder. And that after their daughter was born Mr. Gregory and Skylar[sic] Meekins fought frequently; Gregory would hit Skylar[sic], and it would end up in terrible screaming and fighting. "Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) (referencing Strickland, 466 U.S. at 689).

(Record citations omitted).

Once again, we conclude that the trial court's findings of fact are supported by competent, substantial evidence and we agree with the trial court's mixed findings of fact and law as to the reasonableness of the strategic decision, as well as the lack of deficiency and prejudice, explained more fully below. Attorney Wood testified that he decided not to call Sherri Meekins because she was a "loose cannon" and because he did not want her to be able to say that Gregory had called her the day before the murders with a plan to come see Skyler. Meekins testified

- 16 -

in her deposition and at the evidentiary hearing that Gregory called her and had wanted to come to the Meekins' property on the night of the murders to pay Skyler for a puppy. Meekins thought this was unusual because he had obtained the puppy some time before that. Meekins also testified that she suffers from a long history of mental illness and was manic at the time of the trial. Although Meekins testified at the evidentiary hearing to some points that could be helpful to Gregory, she also testified that she could not differentiate between guns; had never seen Gregory touch the gun in the closet with the vacuum cleaner; Gregory was one of the oldest people who hung out at the Meekins' residence, while the other kids were middle- and high-school aged; she was bothered by Gregory's behavior including an incident where he just came into her house uninvited in the middle of the night; and Gregory knew which doors were locked, which ones were not, and which ones were broken in the house where Skyler lived.

Further, Gregory's reliance on Sears v. Upton, 561 U.S. 945, 951 (2010), Porter v. McCollum, 558 U.S. 30, 39 (2009), and Williams v. Taylor, 529 U.S. 362, 396 (2000), is misplaced. In those cases, the Supreme Court acknowledged that potentially helpful evidence may not have been uniformly favorable to the defendant, but counsel's failure to investigate and develop that evidence fell below the standards expected of a reasonable capital defense attorney. In this case, by contrast, Attorney Wood carefully considered calling Meekins to testify. However,

after concluding that her testimony was more harmful than helpful, he decided against it. This is the quintessential strategic decision, made after considering and weighing the benefits versus the harms. Accordingly, we conclude that Gregory's attorney was not deficient in this respect.

Additionally, Gregory has failed to demonstrate prejudice. As the State notes, had Attorney Wood called Sherri Meekins to testify that she saw Gregory shooting a gun, such information would not have lent any more credibility to Gregory's defense, nor would it have created reasonable doubt. Moreover, the State could have cross-examined Meekins and elicited such information as Gregory was planning on coming over to the Meekins residence on the night of the crimes for a reason she described as "strange" and that she was bothered by Gregory's behavior including an incident where he just came into her house uninvited, in the middle of the night. Because Attorney Wood made a reasonable strategic choice after a thorough examination of the case, and even if trial counsel had elicited testimony from Sherri Meekins, there is no prejudice as our confidence in the outcome is not undermined.

Accordingly, Gregory is not entitled to relief on this claim.

### 3. Failure to Impeach the Testimony of State Witnesses Patrick Giovine and Tyrone Graves

Gregory contends that trial counsel was ineffective for failing to impeach two jailhouse "snitches" who testified for the State at trial. The postconviction court denied this claim, stating:

> During the trial both Mr. Graves and Mr. Giovine were called by the state to testify about conversations they claimed to have had with Mr. Gregory in the Flagler County Inmate Facility; one witness prior to the murders and one witness after. The witness Graves was unable to identify anyone in the courtroom of being William or Billy Gregory, the Appellant. A review of the record demonstrates Attorney Wood successfully crossexamined Mr. Graves on many of the statements he made, including impeaching him with prior statements. Likewise, Attorney Wood conducted a thorough cross-examination of witness Giovine.
>
> At the evidentiary hearing Trial counsel testified that he handled the discrepancies in their testimonies on cross-examination. He felt he had effectively impeached them to poke holes in the state's case. He stated "[b]ased on the responses they gave and their demeanor and the way they appeared, I did not think the state had good witnesses out of either of those two individuals." "Fair assessment of attorney performance, for purposes of reviewing claim for ineffective assistance of counsel, requires that every effort be made to eliminate distorting effects of hindsight, to reconstruct circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time." Blake v. State, [180 So. 3d 89] (Fla. 2014) (citing Strickland, 466 U.S. at 689). Review of the trial record does not demonstrate a deficiency; counsel appeared to have carefully picked issues he wished to impeach the witnesses on. Counsel made a strategic decision; counsel's reasonable trial decisions do not constitute ineffective assistance of counsel. Jones v. State, 845 So. 2d 55, 65 (Fla. 2003). Further, the testimony of these two witnesses was not prejudicial to the outcome of the case.

(Record citations omitted.)

The postconviction court's factual findings are supported by competent, substantial evidence and its conclusions as to deficiency and prejudice are not in error. Gregory contends that Attorney Wood should have used statements Giovine made during an initial interview with an investigator,[3] which were inconsistent with the evidence presented at trial prior to Giovine's testimony in order to impeach Giovine. On cross-examination, trial counsel impeached Giovine with one prior felony conviction and one felony withheld; the fact his prison exposure was sixty years and he had entered a plea for eight to twelve years; the fact he had threatened the State that he would not testify unless he got a better deal; and the fact he was not going to testify but to save his own skin. It is clear that trial counsel had Giovine's statements, was familiar with them, and could impeach

---

3. During his interview Giovine stated: "[Gregory] just said . . . he told me they got shot—shot twice, both—each of them got shot twice." Giovine said the victims were both shot once in the chest and in the head. Giovine stated that "Dan was on the floor and Skyler was on the bed," and that the police never found the murder weapon. Finally, Giovine said that only Skyler, Dan, and Skyler's grandfather were in the house at the time of the murders. During this same interview, Giovine admitted he had read documents which belonged to Mr. Gregory, specifically newspaper articles about the murders. However, prior to Giovine's testimony, the following unrefuted evidence was introduced by the State: (1) Meekins and Dyer were both lying on the bed at the time of the murders; (2) Meekins and Dyer were both shot once in the head; (3) the murder weapon was found on the floor next to the bodies and; (4) Meekins, Dyer, both Meekins' grandparents, and Kyla were all in the house at the time of the murders.

Giovine with the information contained therein if he thought it was beneficial to do so.

On cross-examination, trial counsel impeached Graves with his five prior felony convictions; the fact his first-degree felony charge was still pending and his possible prison exposure; the fact he had talked to a guard and other inmates, and read an article pertaining to the murders prior to giving his statement; and the fact he had been a confidential informant previously. Gregory used Graves' jail PIN to call Skyler in an attempt to trick her into answering because she would not answer for Gregory. Based on Attorney Wood's impeachment of Graves at trial, it is clear that Attorney Wood had Graves' statements, was familiar with them, and could impeach Graves with the information contained therein if he thought it was beneficial to do so.

"[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." McLean v. State, 147 So. 3d 504, 510 (Fla. 2014) (quoting Strickland, 466 U.S. at 687). As with other decisions Gregory's attorney made, the assertions regarding deficiency are classic attempts to assess counsel's conduct after the fact.

In this case, Gregory has not established that reasonable trial counsel would have used the statements to impeach Graves or Giovine as opposed to attacking the testimony on cross-examination as Attorney Wood did. It is unclear what Attorney Wood could have done differently that would have been more effective in this case.

Further, Gregory has failed to explain how he was prejudiced by any alleged deficiency. As Attorney Wood testified at the evidentiary hearing, he did not believe, following his cross-examination of both witnesses, that "the State had good witnesses out of either of those two individuals." There can be no prejudice for failing to further impeach Graves because even without Graves' testimony, the State could still argue that Gregory would repeatedly call Skyler in an attempt to reach her and then become frustrated when he could not. As to Giovine, who later recanted his testimony—the subject of Gregory's newly discovered evidence claim —the State presented three other jailhouse informants who testified in varying ways, including that Gregory prophetically stated that he would "blow [the victim's] f'ing head off" if she cheated on him. Giovine did not testify that Gregory actually confessed the murder to him, but only that Gregory said that he "did what he had to do" and that Giovine assumed that Gregory meant committing the murders.

Accordingly, Gregory is not entitled to relief on this claim.

### 4. Failure to Object to an Erroneous Transcription

Gregory contends that Attorney Wood was ineffective for failing to object to the erroneous transcription of one of the jailhouse phone calls presented at trial. Specifically, Gregory contends that on the call he actually stated to his mother: "I tried calling back a couple of times and that f***ing told me that, you know, she wasn't there," while the call was transcribed to indicate that he stated: "I tried calling back a couple of times and that f***er told me that, you know, she wasn't there." The postconviction court denied this claim, stating:

> Trial counsel failed to correct a significant word found in state's Ex #73—"f[***]er" instead of "f[***]ing." Ex. # 73 is audio recording of a jail call. It is alleged the transcript contained the error; Appellant also claims the transcript, with error, improperly went back with jury for deliberation.
> At the evidentiary hearing Attorney Wood testified that the ultimate meaning of the call did not change: "to listen to the phone call, it was very clear that Mr. Gregory was not happy about Mr. Dyer being in the picture at all." Mr. Gregory did not protest to Attorney Wood that what was being presented to the jury was inaccurate. Mr. Gregory made no showing that the jury having read the word "f[***]er" instead of "f[***]ing" would have been, more inclined to find him guilty.
> The transcripts in this case were properly used as demonstrative aids and did not go back to the jury room. Attorney Wood testified it is his common practice to inspect the evidence that's been marked before the bailiff takes it back to the jury room and he did that in this case. He would not allow unmarked exhibits to go back to the jury room.
> June Laws, the deputy clerk in the case sub Judice, testified that she separates marked exhibits from demonstrative aids, and only marked exhibits are given to the bailiff to take into the jury room. Deputy Taylor, the bailiff in this case, testified that he only took the marked exhibits back to the jury room.

- 23 -

> Additionally, the Court repeatedly advised the jury to rely on the audio, it was the evidence; the transcripts were simply an aid. Mr. Gregory has failed to meet his burden, neither deficiency nor prejudice was shown as required by <u>Strickland</u>.

(Record citations omitted.) We agree. Gregory did not produce any evidence to support his assertion that the word "f***ing" was, in fact, transcribed inaccurately as the word "f***er," or that the difference in words undermined confidence in the outcome of the case.

Attorney Wood testified that Gregory was sitting beside him at counsel table, going through the transcripts as the jailhouse calls were being played for the jury, and Gregory never relayed to Attorney Wood that the calls had been inaccurately transcribed or otherwise indicated the transcription said something different from what he had said on the call. Moreover, Gregory did not produce any evidence demonstrating that the meaning of the jailhouse call was at all changed by the exchange of expletives from the noun to the adjective form, or that the jury, having read the word "f***er" in the demonstrative aid rather than "f***ing," would have been more inclined to find Gregory guilty. Attorney Wood testified that, regardless of the word, the overall meaning and intent behind the call was clear: Gregory was not happy that Meekins was dating another man.

Finally, the jury saw the transcript twice—once while the call was played and again on an overhead projector during closing arguments. There was testimony during the evidentiary hearing that the transcripts were properly used as

demonstrative aids and did not go back into the jury room. Each transcript was collected at the end of the phone call to which it pertained. Accordingly, we conclude that Attorney Wood was not deficient.

Additionally, we conclude there was no prejudice in this case. Gregory has not demonstrated that the jury would have reached a different conclusion if the transcription, which they saw only twice for a short period of time, read "f***ing" instead of "f***er." As Attorney Wood testified at the postconviction evidentiary hearing, regardless of the word choice, from Gregory's tone and demeanor during the phone call, it was clear that Gregory was not happy that Dyer was in the picture. Thus, it was Gregory's overall tone and demeanor on the call that was the most damaging aspect of the testimony, not the exact language he used.

Accordingly, Gregory is not entitled to relief on this claim.[4] We now address the newly discovered evidence claim that also relates to the guilt phase.

**GREGORY'S SUCCESSIVE MOTION FOR POSTCONVICTION RELIEF BASED ON NEWLY DISCOVERED EVIDENCE**

After the circuit court's denial of Gregory's postconviction claims of ineffective assistance of counsel, Gregory filed a successive postconviction motion in the circuit court alleging newly discovered evidence. Specifically, Gregory's

---

4. Because Gregory has failed to prove ineffective assistance of counsel on each of the underlying claims, we also conclude that Gregory is not entitled to relief on his claim of cumulative error.

motion was based on the affidavit of State witness, Giovine, which purports to recant the testimony Giovine gave during Gregory's original guilt phase trial. Because the denial of the postconviction motion was on appeal, this Court relinquished jurisdiction for the trial court to address this newly discovered evidence claim.

The circuit court did not hold an evidentiary hearing but denied Gregory's motion after concluding that although Giovine's statement appeared to be a recantation of his prior testimony, it would not have led to an acquittal or lesser sentence for Gregory in light of the evidence presented against him.

A defendant may obtain a new trial based on newly discovered evidence if he satisfies two requirements. "First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence." Tompkins v. State, 994 So. 2d 1072, 1086 (Fla. 2008). "Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Id. (citing Jones v. State, 709 So. 2d 512, 521 (Fla. 1998)). "If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence." Id. (citing Jones v. State, 591 So. 2d 911, 915 (Fla. 1991)). In cases concerning recanted testimony as newly discovered evidence, the court must be satisfied that

the recantation is true and that the recanted testimony would probably render a different outcome in the proceeding. Davis v. State, 26 So. 3d 519, 526 (Fla. 2009). Further, when "determining the impact of the newly discovered evidence, when a prior evidentiary hearing has been conducted, the trial court is required to consider all newly discovered evidence which would be admissible at trial and then evaluate the 'weight of both the newly discovered evidence and the evidence which was introduced at trial.' " Melton v. State, 193 So. 3d 881, 885 (Fla. 2016) (quoting Jones, 709 So. 2d at 521).

Regardless of whether the affidavit represents a recantation of Giovine's testimony, we agree with the postconviction court that the new testimony would not have resulted in an acquittal on retrial. As the postconviction court stated:

> At trial, the State presented several witnesses who provided overwhelming evidence of Defendant's guilt. Mr. Bowling, Defendant's former co-worker, testified that Defendant commented that if his girlfriend ever cheated on him, he would kill her and the other man. Defendant's former cell mate, Mr. Graves, testified that Defendant told him that if he were to ever catch the victim cheating, "he was going to blow her f***ing head off." Another former cell mate, Mr. Goebel, testified that Defendant told him that he watched victim Meekins' house, that he killed her, and that his family would be his alibi for the murders. Mr. Goebel also testified that Defendant told him that he was surprised that he tested positive for gun residue since he went into the swimming pool after the incident in an effort to remove any gun residue that may have been present.
> A friend of victim Dan Dyer, Mr. Green, testified that victim Dyer told him that Defendant stated that victim Dyer ruined his life. Victim Meekins' neighbor, Mr. Mahoney, testified that on the night of the murders he heard noises outside of his house and voices that stated "we're over here" prior to hearing a car door close. Mr. Mahoney's

testimony rejects Defendant's theory that it was impossible to have walked to victim Meekins' home when the crimes were committed. Mr. Tucker, a Florida Department of Law Enforcement Analyst, testified that Defendant's fingerprints were found on the shotgun that was used in the murders.

Additionally, testimony was presented at trial that Defendant was possessive and excessively called victim Meekins wanting to know her whereabouts and who she was with when she was not home. Audio recordings of Defendant and victim Meekins' brother, Colton Meekins (hereinafter "Mr. Meekins"), were played to the jury. The audio recordings reflected that Mr. Meekins went into victim Meekins' online accounts and read and erased messages from other men. The audio recordings also reflected that Defendant admitted that he went into victim Meekins' online account in the past and deleted messages from other men. The jury heard telephone calls between Defendant and his brother, Kory Gregory (hereinafter "Mr. Gregory"), that reflected Defendant's attempt to influence his family members' statements.

(Record citations omitted.)

We conclude that, for the same reasons we find that Gregory was not prejudiced by his attorney's failure to further impeach Giovine during the trial, Gregory would not have been acquitted had he been granted a new trial based on the newly discovered evidence of Giovine's recantation.

Accordingly, we affirm the postconviction court's order denying Gregory relief.

**Hurst**

In Hurst v. Florida, 136 S. Ct. 616 (2016), the United States Supreme Court held that Florida's capital sentencing scheme was unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to

impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. On remand, this Court held that a unanimous jury recommendation is required before the trial court may impose a sentence of death. Hurst, 202 So. 3d at 57. Moreover, this Court held that "in addition to unanimously finding the existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are sufficient for the imposition of death and unanimously find that the aggravating factors outweigh the mitigation before a sentence of death may be considered by the judge." Id. at 54. This Court also determined that Hurst error is capable of harmless error review. Id. at 68.

Hurst applies retroactively to defendants whose sentences became final after the United States Supreme Court issued its decision in Ring v. Arizona, 536 U.S. 584 (2002). Mosley, 209 So. 3d at 1283. Thus, Hurst applies retroactively to Gregory's sentences, which became final in 2013. Accordingly, we must determine whether the Hurst error during Gregory's penalty phase proceeding was harmless beyond a reasonable doubt.

As this Court has stated, "in the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to [the] death sentence." Hurst, 202 So. 3d at 68. As applied to the right to a jury trial with regard to the facts

necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that each aggravating factor was proven beyond a reasonable doubt, that there were sufficient aggravating factors to impose death, and that the aggravating factors outweighed the mitigating circumstances. Id.

In Gregory's case, we conclude that the State cannot establish that the Hurst error was harmless beyond a reasonable doubt. Here, the jury neither unanimously made the requisite factual findings nor unanimously recommended a sentence of death. Instead, the jury recommended both of Gregory's death sentences by a vote of seven to five. Therefore, this Court has no way of knowing if the jury unanimously found whether the four aggravating factors—(1) the murders were committed by a person previously convicted of a felony who was on felony probation; (2) Gregory was previously convicted of a prior violent felony; (3) the murders were committed during the course of a burglary; and (4) the murders were committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification (CCP)—were sufficient to impose a sentence of death or whether the aggravating factors outweighed the mitigating circumstances. In this case, the trial court found one statutory mitigating circumstance—the murders were committed while Gregory was under the influence of extreme mental or emotional disturbance—and six nonstatutory mitigating circumstances. This Court

cannot speculate why the five jurors who voted to recommend a sentence of life imprisonment determined that a sentence of death was not the appropriate punishment. Thus, we conclude that the Hurst error in Gregory's case was not harmless beyond a reasonable doubt. In doing so, we note that the jury in Gregory's case recommended a sentence of death by the same narrow vote that Timothy Lee Hurst's jury recommended death where the aggravating factors presented required a factual determination. See Hurst, 202 So. 3d at 47.

Accordingly, we vacate Gregory's death sentences and remand for a new penalty phase.

### HABEAS PETITION

In a separate petition for writ of habeas corpus, Gregory raises a Hurst claim, which we have already addressed and granted him relief. The only substantive claim that Gregory raises in his habeas petition regarding the guilt phase is that Gregory's attorney on direct appeal was ineffective for failing to raise the issue that Gregory's jailhouse phone calls should not have been admitted at trial.

First, to the extent Gregory contends that appellate counsel was ineffective for failing to argue that the court erred by admitting, over the defense objection, the jailhouse phone calls that were introduced by the State, we conclude that Gregory is not entitled to relief. Appellate counsel is not required to argue every preserved issue on appeal, particularly when that issue is meritless. In Simmons v.

<u>State</u>, 105 So. 3d 475, 512 (Fla. 2012) (citing <u>Davis v. State</u>, 928 So. 2d 1089, 1126-27 (Fla. 2005)), this Court recognized that appellate counsel cannot present every conceivable claim on direct appeal.

Because we conclude that the trial court did not abuse its discretion in allowing the jailhouse phone calls to be admitted, we deny relief as to this claim. The phone calls at issue were taped while Gregory was incarcerated during the summer of 2007, before the murders. In denying the defense's motion in limine with respect to the calls, the trial court stated:

> The State MAY offer as evidence relevant recorded telephone conversations between the Defendant and certain witnesses while the Defendant was incarcerated in the Flagler and St. Johns County Jails. These calls include, but are not limited to, the following:
> a. Conversations between the Defendant and Skyler Meekins' brother, Colton Meekins, prior to the murders concerning Skyler Meekins' whereabouts, activities and communications as they related to other guys. These conversations include, but are not limited to requests by the Defendant for Colton Meekins to access Skyler Meekins' home computer, review her personal e-mails and MySpace account, and delete photographs of and communications between other guys. Such conversations are relevant to the issue of motive and are, accordingly, admissible at trial.
> b. Conversations between the Defendant and Skyler Meekins, Kory Gregory and/or Linda Probert prior to the murders concerning the relationship between the Defendant and Skyler Meekins, Skyler Meekins' conduct, and/or the Defendant's plans when he was released from jail. These-conversations provide the context and background of the relationship and are relevant to the issue of motive.
> c. Conversations between the Defendant and Kory Gregory and Linda Probert after the murders pertaining to his association to the murders, or the lack thereof. Such statements are clearly relevant to the issues of this case.

      d.  Conversations between the Defendant and Amber Curnutt after the murders in which the Defendant discusses shooting a gun the day before the murders and her relaying that information to law enforcement.  As stated previously, these statements are relevant to the issue of the Defendant's consciousness of guilt.

      These calls, collectively, are quite lengthy and include a number of conversations that are not relevant to any issue in the case.  These irrelevant conversations must be redacted prior to their publication of them at trial.  Counsels for the State and the Defendant have agreed to collaborate and attempt to agree on the necessary redactions.  To the extent that the parties are not able to agree, then they will submit to the court those conversations that remain in dispute, at which time the court will resolve the matter.

This ruling was not erroneous.  The calls may have painted Gregory in a bad light, as Gregory contends; however, they also had considerable probative value as to the context of Gregory's relationship with Meekins and Gregory's possible motive for the crime.  Additionally, the trial court required the State to redact the phone calls by removing any irrelevant information.  Accordingly, had appellate counsel raised this claim on appeal it would have been rejected.  Appellate counsel cannot be ineffective for failing to raise a meritless claim.  Simmons, 105 So. 3d at 512.

Next, with respect to Gregory's Cronic[5] claim, this claim is not a proper habeas claim and, in any event, it is without merit as to any inference that his appellate counsel did not function as proper appellate counsel.  While we acknowledge that the appellate brief was only twenty-eight pages, Gregory has

---

5.  United States v. Cronic, 466 U.S. 648 (1984).

failed to address any other meritorious issues that should have been raised. Thus, this claim is meritless.

Accordingly, we deny habeas relief.

**CONCLUSION**

For the foregoing reasons, we affirm the denial of both of Gregory's motions for postconviction relief and we deny Gregory's petition for habeas corpus relief. However, we vacate Gregory's sentences of death and remand for a new penalty phase proceeding under Hurst.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
LEWIS, J., concurs in result.
LAWSON, J., concurs specially with an opinion.
POLSTON, J., concurs in part and dissents in part with an opinion, in which
CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

LAWSON, J., concurring specially.

See Okafor v. State, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at
*6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to Hurst.

CANADY, J., concurs.

An Appeal from the Circuit Court in and for Flagler County,
        Joseph David Walsh, Judge - Case No. 182007CF000866XXXXXX
And an Original Proceeding – Habeas Corpus

Jim Viggiano, Capital Collateral Regional Counsel, Middle Region, Julie A. Morley, and Mark S. Gruber, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Tayo Popoola, Assistant Attorney General, Daytona Beach, Florida,

        for Appellee/Respondent