DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

BRENDAN SIGISMONDI,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D21-2391

_____

January 12, 2024

Appeal from the Circuit Court for Pasco County; Mary M. Handsel,
Judge.

Jason T. Forman and Dalianett Corrales of Law Offices of Jason T.
Forman, P.A., Fort Lauderdale, for Appellant.

Ashley Moody, Attorney General, Tallahassee, and Blain A. Goff,
Assistant Attorney General, Tampa, for Appellee.


KHOUZAM, Judge.

Brendan Sigismondi appeals his conviction and sentence for third-
degree felony murder (aggravated battery great bodily harm), a lesser-
included offense of second-degree murder.  Sigismondi raises a number
of claims, and we affirm in all respects.  However, we write to explain our

reasoning as to Sigismondi's first argument—that the trial court abused its discretion by excluding the testimony of defense witness Paula Datlow.

**BACKGROUND FACTS**

In the early morning hours of August 26, 2017, Thomas Blow's body was discovered by a cab driver in the road in front of the house where Sigismondi lived. Blow had been fatally stabbed in the chest. Sigismondi was charged with his murder.

At trial, there was no dispute that Sigismondi killed Blow. The State argued Sigismondi had killed Blow out of ill will, hatred, spite, or evil intent, whereas Sigismondi claimed he had done so in self-defense.

Sigismondi went to trial on the charges of second-degree murder as well as battery. The alleged battery victim was Sigismondi's then-girlfriend, Stephanie Trost. The jury ultimately found Sigismondi guilty of the lesser-included offense of third-degree felony murder (aggravated battery great bodily harm) and acquitted him of the battery.

*The State's Case*

The State's theory was that Sigismondi had killed Blow because Blow was sleeping with Trost. On the night of his death, Blow had met up with Trost at a local park. According to the State, when Trost returned to the home she and Sigismondi shared, he attacked and beat her. Immediately upon being separated from Trost, Sigismondi walked out the front door to see Blow on his bicycle on the sidewalk by the mailbox. "What are you doing here, mother fucker?" Sigismondi yelled and then ran over twenty feet from the front door to attack Blow with a knife.

In support of this theory, the State presented Trost's testimony that in August 2017 she was dating and living with Sigismondi at his aunt's

2

house.  She also had an ongoing sexual relationship with Blow.  She described Blow and Sigismondi as "friends" until the summer of 2017.  Although she had not personally observed any physical altercations between the two men, "[t]hey had gotten into verbal arguments, even arguments through text message, you know, meet me here, I want to fight you, or things of that nature."  Her relationship with Blow was not a secret, but she and Sigismondi fought about it.  She testified that about a week or two before Blow's death, Sigismondi had told her he wanted to kill Blow.

The night of Blow's death, Trost met Blow at a nearby park.  When she returned home, she lunged at Tiffany, an acquaintance present at the residence that night who Trost believed had stolen her cell phone.  Sigismondi restrained Trost.  But instead of simply preventing a fight, he allegedly dragged her on the ground to another room, hit her in the face, and threatened to kill her.  One of their roommates, Celeste, intervened and suggested Sigismondi go outside.  Trost heard Sigismondi open the front door and say, "There's that motherfucker right there."  She heard somebody yell in the front yard as she fled out the back door.  She stated that she left because she was afraid of Sigismondi, who was "very angry" and had a "violent demeanor."  According to Trost, Sigismondi "carried a knife on him on a daily basis" and she saw the knife on him that night.  Although she did not see it until later, Sigismondi had texted her at 1:18 a.m.: "Fuck you.  You're going to go run off with Tom for the last motherfucking time.  Every single thing of yours is getting put outside."

The State also called Jordan Jobes, who testified that Sigismondi was an acquaintance of his and that he went to a bar with Sigismondi on the night of the killing.  According to Jobes, Sigismondi got "agitated and irate" when he tried to get in touch with Trost but she was not answering

3

him.  Sigismondi said, "[I]f she was gone with [Blow] again, I'll kill him." When they returned to the house and Trost was not there, Sigismondi "lost it.  He started to snap.  He was screaming."  On cross-examination, Jobes stated Blow had a reputation for and history of violence.  He was a "big dude," a mixed martial arts fighter, and a self-described "badass."

In Sigismondi's recorded interview with police, he claimed that he believed Blow came to the house to fight him.  At approximately 2:00 a.m., Sigismondi was fighting with Trost inside the house, and he went outside to cool down, only to see Blow on his bike by the mailbox near the street.  Sigismondi said, "[H]ey motherfucker what do you want?" Blow got off his bike and said something along the lines of he was going to beat Sigismondi's "ass," and they met each other in the lawn where Blow started swinging at Sigismondi.  Blow swung at Sigismondi twice: Sigismondi blocked the first punch, and the second punch landed on the left side of his head.

After blocking the first punch, Sigismondi claimed, he pulled out the "little pocketknife" that he always carried clipped to his pants.  It was a single blade folding knife that he flipped open.  He stabbed Blow once. Sigismondi claimed he was just trying to get Blow away from him.  Blow had told him many times that he was going to "fuck [him] up" and had been threatening to kill him for weeks.  When asked how he could have flipped the knife open so quickly, he said "it's not that hard" and it takes "two seconds" to pull it out and flip it open.  When asked where he stabbed Blow, he said he did not remember because he just "swung wildly" but maybe in the chest.  Blow grabbed his bike and started walking away, but he collapsed.  Sigismondi ran to his mother's house nearby, tossing the knife in a grassy area on his way.  He stayed with several different friends until he was apprehended later the same day.

4

When he was apprehended, he had a wig and bandana with him—he explained that he had put them on to "change [his] look" as a joke.

Sigismondi admitted that he had injected a prescription painkiller, Dilaudid, around midnight the night of the killing. Sigismondi described himself as about 5'9" and weighing 190 pounds whereas Blow was 6'1" tall and weighed 180 pounds. When Sigismondi was taken into custody, no injuries were noted on his face or head—no bleeding, no cuts, no bruising, no scrapes. There were no injuries on Blow's hands either.

According to Sigismondi, there had been animosity between the two men for years, and they had previously physically fought. Two years before, Sigismondi had gotten the better of Blow in a fight, punching him a few times in the face, so Blow grabbed a pipe off the ground and hit him in the leg with it. When asked why he pulled the knife if Blow was unarmed and he knew that he had previously gotten the better of Blow in a fistfight, Sigismondi said, "[I]t shouldn't have happened." When asked why he was the one who approached Blow if he was afraid of him, Sigismondi admitted that he did so because he was already mad about the situation with Trost.

### The Defense Case

The defense theory of the case was that Blow was the aggressor because he came to the home at 2:00 a.m. for the purpose of attacking Sigismondi and that Sigismondi accidentally killed Blow while trying to defend himself. The defense emphasized Blow's physical strength, his reputation for violence, and the fact that he was under the influence of methamphetamines—a drug that can cause agitation and aggression—on the night of his death.

Sigismondi called a toxicologist who had reviewed Blow's laboratory report and testified that, at the time of death, Blow had over ten times

the therapeutic level of methamphetamine, which could cause "agitation to anxiety all the way to hallucinations, paranoid delusions, and psychosis." There have been quite a few studies finding "a connection between methamphetamine use, their levels, and violent behavior."

Sigismondi took the stand and testified that he had killed Blow accidentally in self-defense. He explained that Blow was bigger and stronger than he was and that during a previous altercation between them Blow had hit Sigismondi multiple times with the handle of a pipe bender that he grabbed from the bed of Sigismondi's truck. Although the two men did not directly communicate with each other, Sigismondi heard from other people that Blow was making threats against him.

The Wednesday before his death, Blow repeatedly texted Sigismondi that he wanted to meet at a nearby park to fight. He told Sigismondi that he needed to "man up and come fight him" or the next time they saw each other he would "beat [Sigismondi] to death." Sigismondi blew him off, believing the threat was all talk. Sigismondi admitted that he had not mentioned this alleged death threat during his recorded police interview.

Sigismondi testified that on the night of Friday, August 25, he was on the way home from a bar with Jobes and several others when he learned that Trost and Blow were together at the park. Sigismondi said he "wasn't happy with it" but denied being mad or making threatening remarks about Blow. When Trost arrived back at the house, she "came storming down the hallway screaming" at Tiffany. To prevent her from attacking Tiffany, Sigismondi grabbed Trost and pushed her back down the hallway, intending to push her back out of the house. Celeste separated them, and Sigismondi went out the front door while Trost went out the back door.

As he walked out into the front yard, Sigismondi saw Blow with his bicycle down by the mailbox, which was in the grass between the sidewalk and the street. Sigismondi admitted that he was the one who approached Blow, traversing approximately twenty-one feet toward Blow, and that the altercation occurred "maybe four feet into the yard." He tried to tell Blow to leave, but all he could get out was "hey motherfucker" before Blow started punching him. Sigismondi blocked one punch before another landed on the left side of his head. When confronted with the police photographs showing no visible injury to the left side of his head, Sigismondi explained that they were taken twenty-four hours after Blow hit him, so the redness and swelling had gone down.

Sigismondi maintained that he was "pissed" but not "in a rage." He was in fear for his life because Blow was "extremely angry" and had previously made threats against Sigismondi. Blow had shown up to the house and entered the yard even though it had been made clear that he was not welcome there. Sigismondi admitted, however, that Blow never came to the door or called out to him. Sigismondi also admitted that everyone at the house that night, including himself, was using drugs.

Sigismondi had a knife on him; he normally carried a knife clipped to his pocket. Sigismondi panicked, grabbed his knife, "swung wildly," and "caught him" "the one time in the chest." He was not aiming or trying to kill him, he was just trying to get him to back down. He did not recall stabbing Blow a second time, although he admitted he must have because Blow suffered a second stab wound to his arm. Blow grabbed his bike and started walking away, but he just "toppled over."

In shock and panic, Sigismondi listened to his friend's advice to leave. He ran to his mother's house across the street, where he changed out of his bloody clothes and tossed the knife in a cabinet. He then went

to a series of different friends' houses.  He claimed he was never going to deny killing Blow, and everyone was telling him to turn himself in, but he was scared.  He was finally apprehended later that day at a gas station.  He had a wig and bandana with him, which he now maintained had been given to him by his friend who jokingly said they would change his look.

### Closing Arguments

In closing, the State argued repeatedly that *even accepting Sigismondi's version of events*, he had failed to establish a claim of self-defense.  The State pointed to the jury instruction on use of deadly force to prevent imminent death or great bodily harm and argued that Sigismondi was not in danger of suffering great bodily harm according to his own story: "I was punched twice, blocked the first one and the second one landed.  That's not great bodily harm, ladies and gentleman."  The State continued:

> That instruction goes on and says that deadly force is not justified if you find the defendant used the force or threat of force to initially provoke the use of force against himself, meaning he's not entitled to it if he was the primary aggressor, meaning that when he opened his door, saw Thomas Blow on the sidewalk by the mailbox on his bicycle and walked 23 feet up to him saying, what are you doing here, mother fucker, *that's not how self defense works.*
>
>     . . . .
>
> Deadly force is justified when you are preventing a threat that is so high that you have no other choice to prevent death or great bodily harm.
>
> It's not a single punch from a guy that you fought before and that you got the better of him last time you fought.  No.  Yesterday, he said, well, I'm not a fighter.  His interview with [the detective] alone he talked about two fights with Thomas Blow.
>
>      . . . .

8

And *by his own account,* they're about the same size.  Tom had . . . maybe a few inches on him, maybe ten pounds on him by his own account.

.  .  .  .

Okay.  I don't want to have to keep taking it out, but it's not just a little pocket knife as he described it.  He was able to say that because he didn't think they were going to find it when he lied about where it was.  But it's not just a little pocket knife.  It's a deadly weapon.  Pick it up yourselves.

*By his own account,* he brought a knife to a fistfight.  That's not how self-defense works. . . . [I]t says in the instructions, you can meet deadly force—the threat of death or great bodily harm with deadly force, but you can't bring a knife to a fistfight.

. . . No swelling.  No redness.  No scrapes to Mr. Blow's hands, just like there [were] no injuries to the Defendant's face.  So wherever these punches are that Thomas Blow landed on the defendant, they weren't very strong ones.  He wasn't justified.

.  .  .  .

And his actions tell you he knows he shouldn't have taken out the knife.  He was hiding from the police because he knew it was murder.  It's not justified self-defense.

He hits the ground.  He didn't call an ambulance.  It's called consciousness of guilt.  You have to look at his actions to know what he was thinking.  And he knew.  He knew exactly what he had done.

.  .  .  .

He wasn't in fear.  He admits he doesn't know why he took the knife out.  He admits he probably shouldn't have taken the knife out.  And the best part is, ladies and gentlemen, *give him the benefit of the doubt, taking all of his statements at face value, . . . even his version is not justifiable use of deadly force.*

.  .  .  .

[T]he defendant is the one that came running out to Tom and met Tom over near the sidewalk.  That's not self defense.  *You can't say, I was so scared of him, but I ran up to him armed*

9

*with a knife saying, what are you doing here, mother fucker.*
*That's not self defense. [L]ook at the law. It's just not.* And he
can get up and say now, I was in fear for my life, but, again,
it's not supported.

(Emphasis added.) There was no objection to these statements of law or line of argument.

For its part, the defense argued that Sigismondi's version of events was credible and made conclusory assertions that he had acted in self-defense and that Blow was the aggressor because he came to the house. However, the defense never specifically addressed, much less rebutted, the State's repeated contention that Sigismondi's story itself was insufficient to establish self-defense under Florida law.

### **Proffered Testimony**

At issue in this appeal is the trial court's decision to exclude the testimony of Paula Datlow, who Sigismondi sought to call in support of his self-defense claim. Sigismondi proffered Datlow's testimony, in which she stated that she was friends with Sigismondi and Trost. She met Blow once, a week or two before his death. She and her boyfriend joined Blow and Trost at a Ramada Inn in New Port Richey. They asked where Sigismondi was, and Blow responded, "[H]e's not here, and when I see him, I'm going to kick his ass." This was the entirety of Datlow's proffered testimony.

The State argued that Datlow's testimony was simply hearsay without an applicable exception, while Sigismondi argued that Datlow's testimony fell under the state of mind exception to the hearsay rule, section 90.803(3)(a)(2), Florida Statutes (2021). Section 90.803(3)(a)(2) allows for the admission of "[a] statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when

10

such evidence is offered to . . . . [p]rove or explain acts of subsequent conduct of the declarant."

Relying on *Monlyn v. State*, 705 So. 2d 1, 4 (Fla. 1997); *Dorbad v. State*, 12 So. 3d 255, 260 (Fla. 1st DCA 2009); and *D.M.L. v. State*, 976 So. 2d 670, 673 (Fla. 2d DCA 2008), Sigismondi acknowledged that the state of mind exception does not typically authorize admission of a victim's statement in a murder case because the victim's state of mind is not usually at issue; however, where a defendant is claiming self-defense, the victim's state of mind becomes relevant and thus can be admissible under the state of mind exception. According to Sigismondi, Datlow's testimony was admissible to demonstrate Blow's state of mind regarding his intent or plan to fight Sigismondi, which was relevant to show that Blow acted in accordance with that plan when he showed up at the house and punched Sigismondi.

The State responded that Sigismondi had not made a threshold showing that Blow acted in accordance with his prior statement such that this alleged fleeting prior statement could be properly admitted under the state of mind exception. The court excluded Datlow's testimony because it was too remote in time to show Blow's state of mind on the night of the stabbing, the context of the statement was not trustworthy considering Blow made the statement to someone he only met once, and even under Sigismondi's own version of events there was no evidence that Blow was acting according to a plan to attack Sigismondi. Specifically, the court made the following findings:

> Okay. I reviewed all of the case law that the Defense has provided. And I'll note that in almost every case, the statements that we're talking about are statements that are made either contemporaneous with the allegations that occurred or they're made within a day or a day before that

11

occurred, which is—*Monlyn* is the murder case. In that particular case, it was made the day before.

The hearsay statement made with *D.M.L.* is a statement that they attribute to occurring the day of.

Also in the—I think it's *Dorbad*, . . . in that case, they talk about the statement being made almost immediately as it is occurring or just before it occurs. And they even say, we next address the hearsay statement made by the victim. Appellant asserts the disputed hearsay statement was admissible under 90.803(3)(a), and governs the state of mind exception.

It goes on to say, the state of mind exception authorizes the use of hearsay to establish the declarant's state of mind when his or her state of mind is material to the action. When applied to a murder prosecution, the state of mind exception does not typically authorize the use of victim's hearsay statements as establishing the victim's state of mind because the victim's state of mind is not generally a material issue.

In some homicide cases involving claims of accident or self-defense, the victim's state of mind may be pertinent such as when there is the issue of who instigated the confrontation. However, it goes on to use all of the cases that it talks about are cases in which the statements of the victim were at the time or just . . . before the actions. Talking about, in [*Huggins v. State*, 889 So. 2d 743, 757 (Fla. 2004)], allowing the theory the victim willfully left the local shopping mall area or holding that a self-defense claim will open the door to hearsay statements establishing the victim's fear . . . of the accused in the instant case; however, there was no such doubt that the initial instigator of the confrontation was appellant.

And I'll note that I have my personal notes from the taped statement of the defendant in front of me. And he stated to law enforcement that he goes outside to cool off. "He" being Mr. Sigismondi. Tom's outside at a mailbox.

Again, the pictures show the mailbox being at the street, not anywhere close—because some mailboxes are up next to the door. Some mailboxes are at the street. This is a mailbox that's . . . actually at the street level.

12

So he says that Tom is outside at the mailbox and that he goes towards Tom and says, hey . . . mother fucker. What do you want? And he goes towards Tom.

So there's no indication from the testimony of even the defendant's own statement that the victim was acting in furtherance at the time that this fight started of beating his ass. He rode by on his bike and he stopped at his mailbox. That's where he was when this whole thing started. We don't know why he was there. There's no indication of was he there for Tiffany, was he there for Jobe[s], was he there for the defendant, was he there for Stephanie. We have no idea why he's there, but he's on his bike by a mailbox, which is, by the testimony of the forensic specialist . . . , 30 feet from the front door. So it's clearly not at the front door and defendant's statements are that he goes towards Tom.

There is plenty of testimony already in the record at this point of the, lack of a better term, prior relationship between the parties, that both of them had stated or had engaged in physical confrontations between each other. So the jury can make any determination that they want. But I think there's plenty of testimony at this point that this one statement two weeks before and she says, he's not here; when I see him, I'm going to kick his ass, could be considered a state of mind two weeks later. It just—it doesn't—it doesn't fit.

If he made it two hours earlier when he was at the park, I'd probably allow it. If he made it a couple hours before, I'd let it [in]. But we're talking two—weeks before made to a person who doesn't even know him. So we don't know, like, was he kidding? Was he serious? Did he—he didn't leave to go to find the defendant. So clearly this does not show a state of mind of the victim at the time back on August 26th when this offense occurred. And, again, there is plenty of testimony in the record about animosity between the parties.

So the jury can make that what they will. But this one is too remote in time of the Court to find that it meets the state of mind exception. So I am going to exclude Ms. Datlow from testifying to that statement.

Sigismondi did not specifically dispute the court's remoteness finding, address the question of remoteness at all, or direct the court's attention

13

to cases where more remote prior statements had been admitted under the state of mind exception.

**ANALYSIS**

For the first time on appeal, Sigismondi argues that the court abused its discretion by excluding Datlow's testimony on the basis that it was too remote and points to case law affirming the admission of statements of intent made months before the relevant offense. *See Gregory v. State*, 118 So. 3d 770, 780-81 (Fla. 2013) (affirming admission of defendant's statement of intent made eight months before murder); *Hardy v. State*, 716 So. 2d 761, 764 (Fla. 1998) (affirming admission of defendant's statement of intent made up to two months prior to murder); *see also LaMarca v. State*, 785 So. 2d 1209, 1214 (Fla. 2001) (listing defendant's prior statement among evidence of defendant's guilt in harmless error analysis without ruling on whether it was properly admitted). But neither this specific argument nor the case law supporting it was presented to the trial court. To the contrary, Sigismondi did not dispute below the trial court's express finding that two weeks was too remote in the particular context of this case.

Rather, the trial transcript reveals that the cases Sigismondi presented to the court during the discussion of this issue at trial either (1) dealt with statements that had been made the day of or the day before the crime or (2) did not address the question of remoteness at all.

In *D.M.L.*, 976 So. 2d at 673, this court addressed a victim's statement a witness allegedly overheard "right around the same time as the charged offense." We concluded that it was an abuse of discretion to exclude the statement as irrelevant because it was relevant to defendant's theory of defense and the issue of witness credibility. *Id.* at 673-74.

14

In *Monlyn*, 705 So. 2d at 5, the statement at issue was allegedly made by the defendant *the day before* he escaped from prison and two days before he killed the victim and took his truck. The Florida Supreme Court found no error in the trial court's decision to admit a fellow inmate's testimony that the defendant stated he was going to escape from jail, get a shotgun, and kill the first person he saw who had a car. *Id.* The supreme court rejected the argument that the statement was too remote and held that this type of statement, made the day before the defendant had escaped, was "exactly the kind of evidence contemplated by section 90.803(3)(a)(2) . . . as satisfying the state of mind exception to explain subsequent conduct." *Id.*

In *Dorbad*, 12 So. 3d at 259, the First District acknowledged that "[i]n some homicide cases involving claims of accident or self-defense, the victim's state of mind may be pertinent, such as where there is an issue of who instigated the confrontation." (citing *Huggins v. State*, 889 So. 2d 743, 757 (Fla. 2004) (affirming trial court's admission of testimony regarding the victim's plans on the day of her murder)). However, the First District ultimately *reversed* the admission of several hearsay statements where "there was no doubt that the initial instigator of the confrontation was appellant" and "[t]he main relevance of the admission of these statements was to demonstrate the bad character of appellant." *Id.* at 259-60. The timeframe of these statements was not mentioned, and remoteness was not at issue. *See id.*

When the trial judge determined in light of these cases that Datlow's statement two weeks before the murder was too remote in time, the defense did not clarify or object on the basis that there was additional case law where more remote statements had been admitted under the state of mind exception. "In order to be preserved for further

15

review by a higher court, an issue must be presented to the lower court and *the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved.*" *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985) (emphasis added); *see also* § 924.051, Fla. Stat. (2021) (" 'Preserved' means that an issue, legal argument, or objection to evidence was timely raised before, and ruled on by, the trial court, and that the issue, legal argument, or objection to evidence was sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor."). Accordingly, Sigismondi's remoteness argument advanced on appeal has not been preserved for our review.[1]

Even if it had been preserved, we cannot say that the court abused its discretion in excluding this testimony. "A review of Florida case law

---

[1] As the dissent correctly points out, the State failed to argue on appeal that Sigismondi's remoteness argument was unpreserved. But even so, that omission does not require that we treat an unpreserved argument as though it was preserved. As we have explained, even where "the State has not argued the lack of preservation in [an] appeal . . . this court has an independent obligation to ensure that an alleged prejudicial error was properly preserved for appellate review." *Conner v. State*, 987 So. 2d 130, 132 n.2 (Fla. 2d DCA 2008). Consequently, "[w]hile this independent obligation does not excuse parties from raising on appeal the issue of whether an alleged error is properly preserved, we will not base a reversal on an unpreserved error simply because the opposing party failed to bring the lack of preservation to our attention." *Id.* The State's general concession in its answer brief that the "issue of admissibility was properly preserved" does not address the new *argument* for admissibility raised for the first time on appeal and, in any event, does not bind this court. *See, e.g.*, *Livingston v. State*, 311 So. 3d 331, 333 n.1 (Fla. 2d DCA 2021) (explaining "that 'it is the practice of Florida appellate courts not to accept erroneous concessions by the state' " (quoting *Perry v. State*, 808 So. 2d 268, 268 (Fla. 1st DCA 2002))).

indicates that there is no bright-line rule regarding the point at which a prior statement is so remote as to become irrelevant." *Gregory*, 118 So. 3d at 781. The cases that Sigismondi points to on appeal that even address this issue do so by *affirming* courts' exercise of discretion in *admitting* more remote statements of intent by *defendants*; these cases do not necessarily support Sigismondi's argument that it was an *abuse of discretion* to *exclude* a prior statement made by the *victim* under the particular circumstances of this case where there is no bright-line rule to apply. *See Gregory*, 118 So. 3d at 781; *Hardy*, 716 So. 2d at 764.

Next, Sigismondi argues that the trial court abused its discretion by improperly weighing the credibility of Datlow's statement. However, the record shows that the court did not improperly weigh the credibility of Datlow's statement but, rather, properly considered whether the circumstances of the statement were trustworthy. *See* § 90.803(3)(b)(2) (specifically providing that "this subsection does not make admissible . . . [a] statement made under circumstances that indicate its lack of trustworthiness"). The court found that the context of the statement was not trustworthy considering Blow made the statement to someone he only met once. The court also noted that it was unclear whether he was joking or serious, given that he did not leave to go find Sigismondi. Datlow's proffered testimony was brief, with little detail or context, as was Blow's alleged statement. Although reasonable people can disagree with the trial court's assessment, we cannot say that it rises to the level of an abuse of discretion.

It was also within the court's discretion to consider whether there was any other evidence that Blow was acting in accord with his stated plan to beat Sigismondi up the next time he saw him. "[S]tatements admitted under the state of mind exception to the hearsay rule are

17

properly admitted only if they involve the state of mind of the declarant *and there is evidence demonstrating that the declarant acted in accord with the state of mind or intent.*" *Penalver v. State*, 926 So. 2d 1118, 1128 (Fla. 2006) (emphasis added); *see also Combs v. State*, 133 So. 3d 564, 567 (Fla. 2d DCA 2014) (following *Penalver*). The court found that, even under Sigismondi's own version of events, there was no evidence that Blow was acting according to a plan to *attack* Sigismondi.

Sigismondi did testify that Blow punched him on the night in question, but the crux of Sigismondi's self-defense theory was that Blow had come to the house that night for the purpose of attacking him. There was no evidence whatsoever submitted to support that conjecture.[2] Rather, as the court pointed out, the evidence merely showed that Blow was riding by on his bike and stopped by the mailbox about thirty feet from the house—we simply do not know why he was there. Sigismondi admitted that he was the one who approached Blow, already "pissed" and yelling obscenities at him. The court also concluded that Datlow's testimony was not necessary because ample evidence had already been introduced to show that Sigismondi and Blow had a contentious, sometimes violent relationship with each other as well as that Blow had a reputation for violence. Again, although one can disagree with the trial court's assessment, we cannot say that it amounts to an abuse of discretion on this record.

We also conclude that any error was harmless. In considering "whether there is a reasonable possibility that the error affected the

_____

[2] It is this complete lack of evidence to support Sigismondi's theory—*even under his own version of events*—that our dissenting colleague fails to recognize when he asserts that we are reweighing the evidence presented in this case. There simply was no evidence on this point to reweigh.

18

verdict," our "focus is on the effect of the error on the trier-of-fact." *State v. DiGuilio*, 491 So. 2d 1129, 1139 (Fla. 1986). The State argued, without objection or rebuttal from the defense, that even if the jury fully accepted Sigismondi's own version of events, he had failed to establish a claim of self-defense under Florida law, as set forth in the jury instructions provided. The jury's decision to acquit Sigismondi on the battery charge and find him guilty on the lesser-included offense of third-degree murder indicates that it believed his version of events. Given that the jury clearly credited Sigismondi's story, which included the claim Blow had repeatedly threatened him, Datlow's barebones testimony about a fleeting statement made by Blow a week or two before the murder would not have changed the result of the trial. Accordingly, even if the court erred in excluding Datlow's testimony, the error was harmless.

Affirmed.


CASANUEVA, J., Concurs.
ATKINSON, J., Dissents with opinion.
ATKINSON, Judge, Dissenting.

The State charged Brendan Sigismondi with second-degree murder, under section 782.04(2), Florida Statutes, for killing Thomas Blow with a pocketknife, as well as domestic violence battery contrary to sections 784.03(1) & 26.012, Florida Statutes, against Stephanie Trost. At trial, one of Sigismondi's defenses against the murder charge was that Sigismondi had stabbed Blow in self-defense after Blow had come to Sigismondi's house. Following Sigismondi's conviction by a jury of the lesser included offense of felony murder in the third degree, Sigismondi now appeals the trial court's exclusion of a witness' testimony that, a few weeks prior to the fatal incident, the victim Blow reportedly said, "when I

19

see [Sigismondi], I'm going to kick his ass." The trial court rejected Sigismondi's argument that the hearsay statement was admissible under section 90.803(3)(a)2, Florida Statutes (2014), as relevant to establish a homicide victim's plan, intent, or state of mind when the victim's intentions or plans "may be pertinent" to issues such as "who instigated the confrontation." The State conceded in its answer brief that the asserted erroneous exclusion of the testimony is preserved for appeal.[3]

Sigismondi correctly argues on appeal that the trial court erroneously weighed evidence to conclude that the evidence did not support admission of the hearsay testimony of Blow's statement and erroneously concluded that the declaration was too remote in time from the fatal incident to be relevant as evidence of Blow's intent, plan, motive, or design to physically attack Sigismondi to be admissible to explain Blow's subsequent actions on the night of the alleged crime, under section 90.803(3)(a)2. According to testimony presented by Sigismondi and Stephanie Trost, Sigismondi and Blow became friends in 2014, but their relationship was tumultuous even before the deadly altercation that occurred on August 26, 2017. According to Sigismondi, who testified at trial, the two would occasionally get into physical fights. Trost, Sigismondi's girlfriend, also testified that Sigismondi and Blow would argue with each other through text messages, sometimes blustering about how they were going to fight each other.

Tensions between Sigismondi and Blow increased when Sigismondi and Trost began dating in July 2017. Trost and Blow had a sexual

_____

[3] While the State takes specific issue with the preservation of constitutional arguments that were asserted on appeal by Sigismondi but were not addressed in this opinion, the State advanced none of the meritless preservation arguments raised for the first time by the majority in its opinion.

20

relationship prior to Trost's relationship with Sigismondi, and Trost and Blow had gotten together several times after Trost and Sigismondi started dating. When Sigismondi learned about the liaisons between Trost and Blow, he was upset. Trost testified that, about a week or two before the fatal incident, Sigismondi had told her that he wanted to kill Blow. Another witness, Jordan Jobes, claimed that, at a bar the night before the altercation, Sigismondi stated that "if [Trost had] gone with [Blow] again[,] that he'd kill him."

On the night of August 26, 2017, Blow stopped on his bicycle near the mailbox of the house at which Sigismondi was living. As Sigismondi relayed the story, when he saw Blow standing there, Sigismondi said either, "hey motherfucker, what do you want?" or "hey, motherfucker, you have to leave" and then walked out the door towards him. According to Sigismondi, Blow responded by saying that he was "gonna beat [Sigismondi's] ass and then just started punching." In order to defend himself, Sigismondi said that he pulled out his small pocketknife that he always kept with him and stabbed Blow. Blow then began to walk away and fell down and eventually died.

At trial, Sigismondi claimed that, during the altercation, he feared for his safety. He testified that Blow was physically intimidating when compared to Sigismondi. Blow was approximately six feet one inch tall, weighing roughly 190 pounds, and trained in mixed martial arts. Sigismondi was smaller and had no such training.

Sigismondi also testified that Blow had a history of escalating their fights. On one occasion, a couple years prior to the incident, the men fought simply because Sigismondi declined to give Blow a ride at 2:00 a.m. to get drugs. That fight resulted in Blow hitting Sigismondi with a pipe.

21

Sigismondi further contended that Blow had demonstrated a desire to harm him. Sigismondi testified that, two nights before the incident, Blow was repeatedly calling Trost. Sigismondi answered the phone, told Blow to stop calling, and then hung up. Blow responded by sending Sigismondi a string of text messages, calling Sigismondi a "pussy and [saying he] need[ed] to man up and come fight him[,] or the next time [Blow saw him], he[ was] going to beat [him] to death."

To further buttress the claim that Blow had threatened to beat him up the next time he saw him, Sigismondi sought to call Paula Datlow as a witness at trial. Datlow would have testified that, a week or two before the incident, she was at a hotel with Blow and Trost. Datlow inquired about "where [Sigismondi] was." Blow responded by saying that Sigismondi was not there but that "when [he] s[aw] him, [he was] going to kick his ass."

The State objected to Datlow testifying about Blow's purported statement, arguing that it was inadmissible hearsay. The defense countered that the statement was admissible under a hearsay exception because it revealed Blow's state of mind and his intent or plan to initiate a fight with Sigismondi. Whether or not Blow intended to fight Sigismondi, the defense contended, was relevant to demonstrating that Blow was the aggressor the night of his death—a fact important to Sigismondi's defense of self defense.

The trial court ruled against admitting the testimony. From the explanation provided by the trial court, it is apparent that the evidence was excluded primarily on the basis that its remoteness in time from the incident in question rendered it irrelevant to the question of the victim's plan or intent as an explanation for his subsequent conduct and that the

22

evidence of what transpired on the day of the alleged crime did not support Sigismondi's theory that the alleged victim was the aggressor:

> Okay. I reviewed all of the case law that the Defense has provided. And I'll note that in almost every case, the statements that we're talking about are statements that are made either contemporaneous with the allegations that occurred or they're made within a day or day before that occurred . . . . When applied to a murder prosecution, the state of mind exception does not typically authorize the use of victim's hearsay statements as establishing the victim's state of mind because the victim's state of mind is not generally a material issue. In some homicide cases involving claims of accident or self defense, the victim's state of mind may be pertinent such as when there is the issue of who instigated the confrontation. However, . . . all of the cases that it talks about are cases in which the statements of the victim were at the time or . . . just before the actions. . . . .

> And I'll note that I have my personal notes from the taped statement of the defendant in front of me. And [Sigismondi] stated to law enforcement that he goes outside to cool off. [Blow]'s outside at a mailbox. Again, the pictures show the mailbox being at the street, not anywhere close—because some mailboxes are up next to the door. Some mailboxes are at the street. This is a mailbox that's . . . actually at the street level. So he says that [Blow] is outside at the mailbox and that he goes towards [Blow] and says, hey—and I'm going to excuse my language—mother fucker. What do you want? And he goes towards [Blow]. So there's no indication from the testimony of even the defendant's own statement that the victim was acting in furtherance at the time that this fight started of beating his ass. He rode by on his bike and he stopped at his mailbox. That's where he was when this whole thing started. We don't know why he was there. There's no indication of was he there for Tiffany, was he there for Jobe, was he there for the defendant, was he there for [Trost]. We have no idea why he's there, but he's on his bike by a mailbox, which is, by the testimony of the forensic specialist Cain, 30 feet from the front door. So it's clearly not at the front door and the defendant's statements are that he goes towards [Blow].

23

There is plenty of testimony already in the record at this point of the, [for] lack of a better term, prior relationship between the parties, that both of them had stated or had engaged in physical confrontations between each other. So the jury can make any determination that they want. But I think there's plenty of testimony at this point that this one statement two weeks before and she says, he's not here; when I see him, I'm going to kick his ass, could be considered a state of mind two weeks later. It just it doesn't—it doesn't fit. If he made it two hours earlier when he was at the park, I'd probably allow it. If he made it a couple hours before, I'd let it [in]. But we're talking two . . . weeks before[,] made to a person who doesn't even know him.

So we don't know, like, was he kidding? Was he serious? Did he—he didn't leave to go to find the defendant. So clearly this does not show a state of mind of the victim at the time back on August 26th when this offense occurred. And, again, there is plenty of testimony in the record about animosity between the parties. So the jury can make that what they will. But this one is too remote in time for the Court to find that it meets the state of mind exception. So I am going to exclude Datlow from testifying to that statement.

The jury convicted Sigismondi of "felony murder in the third degree (aggravated battery great bodily harm)" with a jury finding that, "During the commission of the offense, the defendant did carry, display or use a deadly weapon" but acquitted him of the battery charge against Trost. The court reclassified his offense and sentenced him to twenty-five years in prison.

"Generally speaking, a trial court's ruling on the admission of evidence will not be reversed unless an abuse of discretion is demonstrated," *North v. State*, 221 So. 3d 1235, 1236 (Fla. 2d DCA 2017) (citing *Armstrong v. State*, 73 So. 3d 155, 166 (Fla. 2011)), but that discretion is "limited by the rules of evidence." *Carlisle v. State*, 137 So. 3d 479, 484 (Fla. 4th DCA 2014) (citing *Washington v. State*, 985 So. 2d 51, 52 (Fla. 4th DCA 2008)). The abuse of discretion "standard is

24

satisfied when 'the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court.' " *Parker v. State*, 89 So. 3d 844, 870 (Fla. 2011) (quoting *Lynch v. State*, 2 So. 3d 47, 80 (Fla. 2008)).

Barring exceptions, a "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is inadmissible hearsay evidence. §§ 90.801(2)(c), 802, Fla. Stat. (2023). A "statement of the declarant's then-existing state of mind . . . , including a statement of intent, plan, motive, [or] design . . . when such evidence is offered to . . . [p]rove or explain acts of subsequent conduct of the declarant . . .[,]" is admissible as an exception to the hearsay rule. § 90.803(3)(a)2, Fla. Stat. (2014).

"All relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. (2018). And the "[e]xclusion of exculpatory evidence violates a defendant's fundamental right under the Sixth Amendment to present a defense." *Williams v. State*, 331 So. 3d 826, 829 (Fla. 2d DCA 2021) (alteration original) (quoting *Scott v. State*, 17 So. 3d 766, 769 (Fla. 4th DCA 2009)). Sigismondi sought to have the statement admitted under section 90.803(3)(a)2 as an exception to the general prohibition against hearsay statements because the statement was evidence of Blow's "intent" or "plan[s]" and was relevant to "[p]rov[ing] or explain[ing] [the] acts of subsequent conduct of" Blow on the day of the altercation. *See* § 90.803(3)(a)2. The trial court abused its discretion by excluding the evidence because the testimony was manifestly a statement of the victim's "intent" or "plan" to attack the defendant, and the trial court's conclusion that the passage of one or two weeks eliminated its relevance to the question of the declarant's state of mind is unreasonable.

25

Additionally, the trial court impermissibly weighed competing evidence to come to its erroneous conclusion that there was no evidentiary support for Sigismondi's theory of defense that Blow was acting in accordance with his previously stated intention to attack him when he showed up at Sigismondi's residence. Because the trial court erroneously excluded relevant, exculpatory evidence that section 90.803(3)(a)2 permits, I would reverse.

Under section 90.803(3)(a)2, "[t]he conduct that the declaration is offered to prove must be relevant to the issues in the case." *Combs v. State*, 133 So. 3d 564, 567 (Fla. 2d DCA 2014) (alteration in original) (quoting Charles W. Ehrhardt, Ehrhardt's Florida Evidence § 803.3b (2011 ed.)). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2023). Thus, the exception permits the admission of a hearsay statement when a declarant's statement of intent, plan, motive, or design make the declarant's alleged, material subsequent acts more or less probable. *See, e.g., Brooks v. State*, 787 So. 2d 765, 771 (Fla. 2001) ("[T]he victim's state of mind may become relevant to an issue in the case where the defendant claims: (1) self-defense; [or] (2) that the victim committed suicide . . . ." (quoting *Woods v. State*, 733 So. 2d 980, 987–88 (Fla. 1999))). The exception also allows for the admission of a statement that reveals such things as the declarant's reasons for or thought process behind the declarant's subsequent acts when they are material to an issue in the case. *See e.g., Peede v. State*, 474 So. 2d 808, 816 (Fla. 1985) (holding that in a trial for kidnapping the State properly produced the declarant-victim's statements as evidence that although the declarant had picked the defendant up at a Miami airport she had no intention "to voluntarily accompany the defendant outside of Miami or to North Carolina"). As

26

such, an announcement of his intention to beat up Sigismondi the next time he saw him, made by Blow a week or two prior to his unexpected arrival on the curb in front of the house, could reveal that the motive for Blow's arrival was his intention to hasten the violent confrontation about which he had previously expressed his plans. *See* § 90.803(3)(a) (allowing admission of hearsay statements evincing a declarant's "motive" when it is offered to "explain acts of subsequent conduct of the declarant").

Thus, Sigismondi correctly argues that Blow's statement to Datlow was relevant to Sigismondi's defense at trial that Blow was the aggressor during the altercation on August 26. § 776.012(2), Fla. Stat. (2014) (providing a justification for the use of "deadly force" when a defendant "reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself . . . or to prevent the imminent commission of a forcible felony"). "In some homicide cases involving claims of accident or self-defense, the victim's state of mind may be pertinent, such as where there is an issue of who instigated the confrontation." *Dorbad v. State*, 12 So. 3d 255, 259 (Fla. 1st DCA 2009). Here, whether Blow was the initial aggressor was critical to Sigismondi's defense. Datlow would have testified that, one to two weeks prior to the fatal incident, Blow stated that he was "going to kick [Sigismondi's] ass." This is a direct statement of Blow's intent, plan, or design to harm Sigismondi upon their next encounter, at which point he did, according to some evidence in the record, appear uninvited and inflict violence upon Sigismondi. *Cf. Penalver v. State*, 926 So. 2d 1118, 1127–28 (Fla. 2006) (explaining that hearsay is admissible under section 90.803(a)2 only "if there is other sufficient evidence to draw the inference that the act or plan was executed" and concluding that hearsay evidence

27

of Hernandez's intention "to go to North Carolina," although "relevant to the intermediate issue of whether [Hernandez] was in town and could have committed the murders," should not have been admitted because "the gap between the intention and whether the act was in fact done [wa]s too great to support an inference that Hernandez was in North Carolina at the time the murders were committed" because there was insufficient evidence "to draw the inference that Hernandez actually went to North Carolina").

The trial court based its conclusion that the statement was not relevant to prove that Blow was the initial aggressor primarily on what the court considered its remoteness in time. The trial court noted that it was made up to two weeks prior to the incident—in its estimation, too "remote in time." The trial court's conclusion is out of keeping with applicable case law. *See e.g., Gregory v. State*, 118 So. 3d 770 (Fla. 2013) (concluding that a defendant's statement made "eight months before the murder to a former co-worker that, if [the defendant] ever caught his girlfriend cheating on him, he would kill them both . . . provide[d] evidence of his motive and intent in murdering his former girlfriend and her new boyfriend[] and . . . was not so remote in time as to have minimal probative value"); *Hardy v. State*, 716 So. 2d 761, 764 (Fla. 1998) (finding a defendant's statement made two months prior to the murder "regarding what would happen if he was involved in a confrontation with police officers . . . was not remote in time and . . . was relevant to the State's contention that [he] intended to resolve any police confrontation with violence and that he would rather kill than be arrested"); *cf. LaMarca v. State*, 785 So. 2d 1209, 1215 (Fla. 2001) (considering an admission by the defendant made "five months before the murder, that he intended to kill the victim constitutes direct evidence of

his 'fully formed conscious purpose to kill.' " (quoting *Norton v. State*, 709 So. 2d 87, 92 (Fla. 1997)).

The trial court's conclusion that the statement was too remote in time to be relevant to the declarant's intent, plan, motive, or design is also inconsistent with logic and a reasonable assessment of the circumstances as set forth in the evidence admitted at trial and the testimony Sigismondi sought to admit. *See Patrick v. State*, 104 So. 3d 1046, 1056 (Fla. 2012) ("[A] trial court abuses its discretion if its ruling is based on an 'erroneous view of the law or on a clearly erroneous assessment of the evidence.' " (*quoting McDuffie v. State*, 970 So. 2d 312, 326 (Fla. 2007)). Importantly, the statute requires that to be admissible, the hearsay statements must be of a "declarant's *then*-existing state of mind," *see* § 90.803(3)(a) (emphasis added), not the declarant's state of mind at a later point in time. In other words, the hearsay evidence must be a statement of a "plan, motive, [or] design" the declarant had *at the time he made the statement* evincing such "then-existing state of mind." *See id.* It is this state of mind at the time of the statement that is admissible to "[p]rove or explain acts of *subsequent* conduct of the declarant." *See id.* (emphasis added).

If Blow and Sigismondi had come into contact during the two intervening weeks between Blow's alleged expression of his intention to "kick [Sigismondi's] ass" and the day of the final altercation and such encounters had been without violent incident, then it is conceivable that the intervening time period might have some propensity to establish a disconnection between the alleged statement and the alleged subsequent act on the day of the alleged crime—such that the prior statement could not reasonably be said to "prove or explain" the declarant's "subsequent conduct." *See* 90.803(3)(a)2. But, to the contrary, there is evidence from

which it could be inferred that Blow carried through on his stated intent, plan, or design the first time he came in contact with Sigismondi after making the alleged hearsay statement.

Neither the trial court nor the State provided any explanation for why it would be unreasonable to believe that Blow would have retained his intent, plan, or design to harm Sigismondi for a week or two. To conclude that he would necessarily have abandoned such intention during this span of time is speculative. Consistent with the hearsay statement's announcement that Blow intended to physically attack Sigismondi the next time he saw him, a physical altercation that ended in Blow's death occurred during the very next encounter between the two individuals following Blow's statement. There were no intervening encounters between Blow's hearsay statement announcing his intention to beat up Sigismondi upon seeing him again and the point at which he did see him again—at which point, according to Sigismondi, Blow made good on his promise to attack him. The hearsay testimony that Blow stated his intent, plan, or design to harm Sigismondi tends to make the claim that Blow was the initial aggressor during the altercation more probable. As such, it is relevant to Sigismondi's claim that he was acting in self-defense and meets the criteria for admission under the hearsay exception in section 90.802(3)(a). *See Getts v. State*, 313 So. 3d 964, 967 (Fla. 2d DCA 2021) ("Where evidence tends in any way, even indirectly, to establish a reasonable doubt of [the] defendant's guilt, it is error to deny its admission." (quoting *Neiner v. State*, 875 So. 2d 699, 700 (Fla. 4th DCA 2004))).

Compounding the error of its conclusion that the statement was irrelevant because it was made one or two weeks prior to the altercation, the trial court also improperly weighed the evidence for and against the

defense theory in support of which the hearsay statement was being introduced and excluded the statement on the basis that there was evidence in the record inconsistent with the defense theory. Instead of focusing on whether the testimony constituted a "statement of the declarant's then-existing state of mind" such that it indicated his "intent, plan, motive [or] design" to attack the defendant in the future, the trial court reasoned that because there were reasons to doubt Sigismondi's claim that it was Blow who was the initial aggressor, the statement could not be introduced under the exception. The judge noted, among other things, that Blow only went up to the mailbox next to the house, and that Sigismondi said, "hey motherfucker," and then proceeded to go out the door and down the driveway to meet Blow.

Section 90.803(3) does require that a trustworthiness analysis be undertaken before a hearsay statement can be admitted under the state-of-mind exception. That, however, does not justify a court basing its *admissibility* determination on its perception of the weight of evidence for or against the party's theory in support of which the hearsay testimony is being admitted. To the contrary, the statutorily mandated trustworthiness inquiry is an analysis of the circumstances under which the hearsay *statement itself* was made. *See* § 90.803(3)(b)2 (excluding from admissibility under the hearsay exception any "statement *made under circumstances* that indicate its lack of trustworthiness" (emphasis added)). The statutory trustworthiness requirement does not contemplate or authorize a weighing of evidence for or against the defendant's theory of defense as part of the admissibility determination— much less the exclusion of such evidence based merely on the ground that there is some contrary evidence in the record. When the trial court pointed out, for example, the evidence that the victim proceeded no

31

further than the streetside mailbox before the defendant advanced toward him down the driveway, the court was weighing the evidence for and against the defendant's theory of defense that the victim was the aggressor; the court was not assessing, as the statute requires, the "trustworthiness" of the prior hearsay statement based on the "circumstances" "under" which the statement was "made" one or two weeks before the altercation. *See* § 90.803(3)(b)2.

The trial court was doing something qualitatively different than the trustworthiness analysis required by the statute. The trial court did not merely conduct an independent assessment of the reliability of the hearsay statement itself at the time it was made—analyzing whether there were any indicia of untrustworthiness derived from the circumstances under which it was given that tend to undermine the credibility of the hearsay testimony. *See e.g.*, *Jones v. State*, 440 So. 2d 570, 577 (Fla. 1983) (considering whether a statement "elicited under an atmosphere of anger spawned from [the defendant's] arrest and confinement . . . [was] unreliable"). Instead, the trial court decided that the hearsay statement was inadmissible because it was contradicted by other evidence in the record. *Cf. Johnson v. State*, 47 So. 3d 941, 943 (Fla. 3d DCA 2010) (ruling that the "trial court abused its discretion when it excluded [the declarant's] prior testimony simply because it contradicted other evidence" under the exception to hearsay in section 90.803(22)).

As does the majority, the trial court astutely identified aspects of Sigismondi's story that undermined his theory of defense. On the other hand, however, Sigismondi presented *supportive* testimony, identifying, for example, an instance only a few days before the incident in which Blow purportedly said he wanted to fight Sigismondi and describing that

32

Blow arrived on the sidewalk next to Sigismondi's house seemingly without an invitation on the night of the alleged crime. Evidence in the record that included competing death threats—with each future combatant having at some point expressed an intention to kill the other—established as a backdrop an erstwhile friendship that had in the past been punctuated by physical altercations. The excluded testimony was directly relevant to the contested issue of the intentions and actions of these on-again-off-again friends when one's unexpected visit to the other's home turned violent. "Typically, juries are presented with different versions of events, and must be trusted to consider and weigh all the evidence and ascertain credibility." *Johnson*, 47 So. 3d at 943. To exclude relevant evidence that meets the criteria for admissibility under a statutory hearsay exception merely because—in the trial court's calculation—it is contradicted by the weight of evidence against the defense theory in support of which it is being adduced disserves the jury and denies the defendant his right to mount a defense. *Cf. id.* ("To determine if the defendant acted in self defense, the jury was entitled to hear everything that occurred prior to the shooting . . . ."); *Wagner v. State*, 921 So. 2d 38, 40 (Fla. 4th DCA 2006) ("A defendant has a constitutional right to present a defense[,] . . . [and] [t]he trial court must protect that right when considering whether to exclude evidence." (quoting *Casseus v. State*, 902 So. 2d 294 (Fla. 4th DCA 2005)).

Even had the trial court in this case undertaken a proper trustworthiness analysis, nothing about the circumstances of the excluded statement indicates that it lacked trustworthiness. Certain purported "self-serving exculpatory statement[s]" made by a defendant might lack "reliability and trustworthiness . . . ." *See Cotton v. State*, 763 So. 2d 437, 442 (Fla. 4th DCA 2000) (concluding that a defendant's

33

"post-arrest statement to the police, wherein he explained his prior state of mind and conduct surrounding possession of the cocaine" and denied "guilty knowledge of the cocaine c[ould not] be construed as a statement of then-existing state of mind offered for the reasons contemplated by section 90.803(3) . . . [because] his statement [was] precisely the type of self-serving exculpatory statement that has been traditionally regarded as inadmissible hearsay because of its lack of reliability and trustworthiness"). Here, by contrast, Datlow was by all indications a disinterested witness who remembers Blow expressing violent intentions toward Sigismondi after the latter's name arose during conversation.

As the majority points out and the trial court observed, there was indeed considerable record evidence supportive of the State's theory that Sigismondi was the aggressor in the fatal fight, including testimony indicating that Sigismondi himself made statements manifesting an intention to kill Blow prior to the night of the incident. However, while the evidence identified by the trial court could be perceived as supportive of the State's theory that Sigismondi was the aggressor, it is Sigismondi's right to introduce any relevant evidence supportive of his contrary theory that Blow was the aggressor if such evidence conforms to the statutory hearsay exception and was made under circumstances that lack indicia of untrustworthiness. *See Patrick*, 104 So. 3d at 1056 ("Every defendant is entitled to present any evidence that tends to support the defendant's theory of defense.").

That evidence included Blow's statement to Datlow indicating his then state of mind and intent for future action. Sigismondi adduced evidence that Blow later acted consistent with his previously stated intention to "kick" Sigismondi's "ass" "when I see him" when Blow subsequently arrived at Sigismondi's home on the night in question. The

34

majority concedes that Blow announced his intention to "beat Sigismondi's ass" shortly after his arrival, whereupon he began throwing punches at Sigismondi. If that did not resolve the curiosity—expressed by the trial court and echoed by the majority—over whether Blow had been "kidding" or "serious" when he previously expressed to Datlow what he planned to do upon next seeing Sigismondi, it is all the more reason to allow the testimony from Datlow, who was the only one in a position to shed light on her perception of Blow's "state of mind" at the time of the declaration and the likelihood that it constituted a "plan" or an expression of his "intent." *See* § 90.803(3) (providing for the admission of a "statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, [or] design . . . when such evidence is offered to . . . [p]rove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action . . . [or] [p]rove or explain acts of subsequent conduct of the declarant"). That is to say, it serves to underscore the importance of allowing *both* sides to adduce the available evidence supportive of their competing theories. Instead, as did the trial court, the majority improperly weighs the evidence for and against Sigismondi's theory to reach the erroneous conclusion that evidence did not support admission of the testimony under the hearsay exception.

Finally, the State's contention that the exclusion of the statement was "harmless" is without merit. "The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). "[T]he harmless error test 'is not a sufficiency-of-

35

the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test'; instead, the 'focus is on the effect of the error on the trier-of-fact.' " *Summerall v. State*, 171 So. 3d 150, 152 (Fla. 1st DCA 2015) (quoting *DiGuilio*, 491 So. 2d at 1139).

The State argues that, because the "jury was made well aware of the past animosity between [Blow] and Sigismondi" and was told Blow was the more physically intimidating individual, and that "Sigismondi testified that [Blow] called him and threatened that he wanted to beat Sigismondi up two days prior to the incident," the exclusion of independent testimony from Datlow affirming that Blow was making statements of his intent to "kick [Sigismondi's] ass" the next time he saw him "had no effect on the verdict." This rationale ignores the benefit of testimony corroborating the defendant's theory of defense. Given the likelihood of the possibility that a jury would suspect that Sigismondi— on trial and in jeopardy of losing his freedom—had a reason to lie, it would be reasonable for a juror to be skeptical of his claims that Blow called and threatened him. By contrast, nothing in the record indicates any similar reason to doubt Datlow, whose parallel testimony might lend credence to Sigismondi's story.

Moreover, under the circumstances, the mere addition of another incident of Blow expressing his violent intentions could serve to incline the jury to believe Sigismondi's testimony about who was the aggressor; here, the additional example of such announcement of intention is not cumulative but rather corroborative because it is unique in relation to the other evidence. That Blow announced to a disinterested party that he was going to "kick [Sigismondi's] ass" could be perceived as more persuasively indicative of his actual intent and plans—and subsequently

36

of his actions—than Blow's text messages and offhand comments during a heated phone call with the defendant. The testimony of Datlow could have increased in the mind of the jurors the probability that Sigismondi's story was true. Crucially, the State cannot satisfy its burden to prove otherwise beyond a reasonable doubt. *See DiGuilio*, 491 So. 2d at 1135.[4]

I would reverse and remand for a new trial because the trial court committed reversible error by excluding Datlow's hearsay testimony. As such, I respectfully dissent.

_____

_____

[4] The majority does not adequately explain its contention that the jury's decision to acquit Sigismondi of the battery of Trost and find him guilty on the lesser-included offense of third-degree murder of Blow indicates that the jury "believed his version of events" and therefore that exclusion of evidence of Blow's statement—testimony germane to the latter but irrelevant to the former—was harmless. However, the burden to establish harmless error is not on the defendant, and the implied findings of the jury's verdict cannot explain away the potential influence the excluded evidence might have had on the jury's perception of Sigismondi's theory of self-defense. Indeed, the jury did not find there was "an unlawful killing of Thomas Blow by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life" in order to find Sigismondi guilty of second degree murder but did find that Sigismondi either "intentionally or knowingly caused great bodily harm" or "used a deadly weapon while" battering Blow so as to commit an aggravated battery causing Blow's death in order to find him guilty of felony murder. But the juxtaposition of those findings does not lead inexorably to a conclusion—on which the majority's harmless error rationale relies—that the jury found all of Sigismondi's story to be so credible that additional evidence supporting his defense would be gratuitous. To the contrary, the possibility that the converse might be true—that independent testimony corroborating Sigismondi's self-defense theory might have convinced the jury that he was not guilty of *any* crime instead of merely not guilty of the greater offense—underscores the inability of the State and the majority to establish harmless error beyond a reasonable doubt.

Opinion subject to revision prior to official publication.